# *EXHIBIT A*

 CT Corporation

**Service of Process Transmittal**
07/23/2021
CT Log Number 539963774

TO:   General Counsel
L Brands, Inc.
3 Limited Pkwy
Columbus, OH 43230-1467

RE:   **Process Served in New Jersey**

FOR:   Bath & Body Works, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Dolores Griechen, Pltf. vs. Bath & Body Works, Inc., et al., Dfts. *Name discrepancy noted.* |
| **DOCUMENT(S) SERVED:** | -- |
| **COURT/AGENCY:** | None Specified Case # CAML220521 |
| **NATURE OF ACTION:** | Personal Injury - Failure to Maintain Premises in a Safe Condition |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, West Trenton, NJ |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/23/2021 at 14:03 |
| **JURISDICTION SERVED :** | New Jersey |
| **APPEARANCE OR ANSWER DUE:** | None Specified |
| **ATTORNEY(S) / SENDER(S):** | None Specified |
| **REMARKS:** | Received for Bath & Body Works, Inc. and forwarded to Bath & Body Works, LLC based upon prior mergers. // The documents received have been modified to reflect the name of the entity being served. |
| **ACTION ITEMS:** | CT has retained the current log, Retain Date: 07/26/2021, Expected Purge Date: 07/31/2021 |
| | Image SOP |
| | Email Notification,  Shanel Anderson  sanderson@lb.com |
| | Email Notification,  General Counsel  gcounsel@lb.com |
| **REGISTERED AGENT ADDRESS:** | C T Corporation System 820 Bear Tavern Road West Trenton, NJ 08628 866-331-2303 CentralTeam1@wolterskluwer.com |

The information contained in this Transmittal is provided by CT for quick reference only. It does not constitute a legal opinion, and should not otherwise be relied on, as to the nature of action, the amount of damages, the answer date, or any other information contained in the included documents. The recipient(s) of this form is responsible for reviewing and interpreting the included documents and taking appropriate action, including consulting with its legal and other

 CT Corporation

**Service of Process Transmittal**
07/23/2021
CT Log Number 539963774

**TO:** General Counsel
L Brands, Inc.
3 Limited Pkwy
Columbus, OH 43230-1467

**RE:** **Process Served in New Jersey**

**FOR:** Bath & Body Works, LLC  (Domestic State: DE)

advisors as necessary. CT disclaims all liability for the information contained in this form, including for any omissions or inaccuracies that may be contained therein.



# PROCESS SERVER DELIVERY DETAILS

**Date:**          Fri, Jul 23, 2021

**Server Name:**          Aziza Amer

| Entity Served | Bath & Body Works, INC. |
|---|---|
| Case Number | CAM-L-002205-21 |
| Jurisdiction | NJ |



RICHARD DiTOMASO, ESQ.
Attorney I.D.: 00381-1996
A Professional Corporation
901 Route 38
Cherry Hill, NJ 08002
(856) 414-0010
Attorney for Plaintiff, DOLORES GRIECHEN

| | | |
|---|---|---|
| **DOLORES GRIECHEN** | | NEW JERSEY SUPERIOR COURT |
| | Plaintiffs | CAMDEN COUNTY |
| | | LAW DIVISION |
| v. | | |
| | | DOCKET NO.: CAM-L-2205-21 |
| **BATH & BODY WORKS, INC.,** JOHN DOES | | |
| A-F (names being fictitious) and ABC | | Civil Action |
| CORPORATIONS 1-10 (names being fictitious) | | |
| jointly, severally and/or in the alternative, | | |
| | | |
| | Defendants | |

### FROM THE STATE OF NEW JERSEY
### TO THE DEFENDANT (S) NAMED ABOVE:

The Plaintiff, named above, has filed a lawsuit against you in the Superior Court of New Jersey. The complaint attached to this summons states the basis for this lawsuit. If you dispute this complaint, you or your attorney must file a written answer or motion and proof of service with the deputy clerk of the superior court in the county listed above within thirty-five (35) days from the date you received this summons, not counting the date you received it. (The address of each deputy clerk of the superior court is provided.) A $175.00 filing fee payable to the clerk of the superior court and a completed case information statement (available from the deputy clerk of the superior court) must accompany your answer or motion when it is filed. You must also send a copy of your answer or motion to plaintiff's attorney whose name and address appear above, or to plaintiff, if no attorney is named above. A telephone call will not protect your rights; you must file and serve a written answer or motion (with fee and completed case information statement) if you want the court to hear your defense.

If you do not file and serve a written answer or motion within thirty-five (35) days, the court may enter a judgment against you for the relief plaintiff demands, plus interest and costs of suit. If judgment is entered against you, the sheriff may seize your money, wages or property to pay all or part of the judgment.

If you cannot afford an attorney, you may call the Legal Services Office in the county where you live. A list of these offices is provided. If you do not have an attorney and are not eligible for free legal assistance, you may obtain a referral to an attorney by calling one of the Lawyer Referral Services. A list of these numbers is also provided.

/s/ *Michele Smith*
Michele Smith
Clerk of the Superior Court

DATED:     July 21, 2021

Name of Defendant to be Served:     **Bath & Body Works, Inc.**
Address of Defendant to be Served:     **c/o Reg. Agent, CT Corporation System, 820 Bear Tavern Road, West Trenton, NJ 08628**

**ATLANTIC COUNTY:**
Deputy Clerk of the Superior Court Civil
Division, Direct Filing
1201 Bacharach Blvd., First Fl.
Atlantic City, NJ 08101
LAWYER REFERRAL
(609) 345-3444
LEGAL SERVICES
(609) 348-4200

**BERGEN COUNTY:**
Deputy Clerk of the Superior Court

Case Processing Section, Room 119Justice
Center, 10 Main Street
Hackensack, NJ 07601-0769
LAWYER REFERRAL
(201)488-0044
LEGAL SERVICES
(201)487-2166

**BURLINGTON COUNTY:**
Deputy Clerk of the Superior Court

Central Processing Office
Attn.: Judicial Intake
First Floor, Courts Facility
49 Rancocas Road
Mount Holly, NJ 08060
LAWYER REFERRAL
(609) 261-4862
LEGAL SERVICES
(609) 261-1088

**CAMDEN COUNTY:**
Deputy Clerk of the Superior Court

Civil Processing Office
1st Floor, Hall of Records
101 S. Fifth Street
Camden, NJ 08103
LAWYER REFERRAL
(856) 964-4520
LEGAL SERVICES
(856) 964-2010

**CAPE MAY COUNTY:**
Deputy Clerk of the Superior Court

9 N. Main Street
Box DN-209
Cape May Court House, NJ 08210
LAWYER REFERRAL
(609) 463-0313
LEGAL SERVICES
(609) 465-3001

**CUMBERLAND COUNTY:**
Deputy Clerk of the Superior Court

Civil case Management Office
Broad & Fayette Streets, PO Box
615Bridgeton, NJ 08302
LAWYER REFERRAL
(856) 692-6207
LEGAL SERVICES
(856) 451-0003

**ESSEX COUNTY:**
Deputy Clerk of the Superior Court

50 West Market Street
Room 131
Newark, NJ 07102
LAWYER REFERRAL
(973) 622-6207
LEGAL SERVICES
(973) 624-4500

**GLOUCESTER COUNTY:**
Deputy Clerk of the Superior Court

Civil Case Management Office
Attn. Intake
First Fl., Court House
1 North Broad Street, PO Box 129
Woodbury, New Jersey 08096
LAWYER REFERRAL
(856) 848-4589
LEGAL SERVICES
(856) 848-5360

**HUDSON COUNTY:**
Deputy Clerk of the Superior Court

Superior Court, Civil Records Dept.
Brennan Court House-1st Floor
583 Newark Avenue
Jersey City, NJ 07306
LAWYER REFERRAL
(201) 798-2727
LEGAL SERVICES
(201) 792-6363

**HUNTERDON COUNTY:**
Deputy Clerk of the Superior Court

Civil Division
65 Park Avenue
Flemington, NJ 08862
LAWYER REFERRAL
(908) 735-2611
LEGAL SERVICES
(908) 782-7979

**MERCER COUNTY:**
Deputy Clerk of the Superior Court

Local Filing Office, Court House
175 South Broad Street, PO Box
8068Trenton, New Jersey 08650
LAWYER REFERRAL
(609) 585-6200
LEGAL SERVICES
(609) 695-6249

**MIDDLESEX COUNTY:**
Deputy Clerk of the Superior Court

Administration Building
Third Floor
1 Kennedy Square, PO Box 2633
New Brunswick, NJ 08903-2633
LAWYER REFERRAL
(732) 828-0053
LEGAL SERVICES
(732) 249-7600

**MORRIS COUNTY:**
Deputy Clerk of the Superior Court

Civil Division
30 Schuyler Pl., PO Box 910
Morristown, NJ 07960-0910
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 285-6911

**OCEAN COUNTY:**
Deputy Clerk of the Superior Court

Court House, Room 119
118 Washington Street
Toms River, NJ 07960-0910
LAWYER REFERRAL
(732) 240-3666
LEGAL SERVICES
(732) 341-2727

**PASSAIC COUNTY:**
Deputy Clerk of the Superior Court

Civil Division
77 Hamilton Street
Paterson, NJ 07505
LAWYER REFERRAL
(973) 278-9223
LEGAL SERVICES
(973) 345-7171

**SALEM COUNTY:**
Deputy Clerk of the Superior Court

91 Market Street, PO Box 18
Salem, New Jersey 08079
LAWYER REFERRAL
(856) 935-5629
LEGAL SERVICES
(856) 451-0003

**SOMERSET COUNTY:**
Deputy Clerk of the Superior Court

Civil Division Office
New Court House, 3rd Floor
PO Box 3000
Somerville, NJ 08876
LAWYER REFERRAL
(908) 685-2323
LEGAL SERVICES
(908) 231-0840

**SUSSEX COUNTY:**
Deputy Clerk of the Superior Court

Sussex County Judicial Center
43-47 High Street
Newton, NJ 07960
LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 231-0840

**UNION COUNTY:**
Deputy Clerk of the Superior Court

1st Floor, Court House
2 Broad Street
Elizabeth, NJ 07207-6073
LAWYER REFERRAL
(908) 353-4715
LEGAL SERVICES
(908) 354-4340

**WARREN COUNTY:**
Deputy Clerk of the Superior Court

Civil Division Office
Court House
Belvidere, NJ 07823-1500
LAWYER REFERRAL
(973) 267-5882
LEGAL SERVICES
(973) 475-2010

RICHARD DiTOMASO, ESQ.
Attorney I.D.: 003811996
A Professional Corporation
901 Route 38
Cherry Hill, NJ 08002
(856) 414-0010
Attorney for Plaintiff, DOLORES GRIECHEN

| | | |
|---|---|---|
| **DOLORES GRIECHEN** | | NEW JERSEY SUPERIOR COURT |
| | Plaintiffs | CAMDEN COUNTY |
| | | LAW DIVISION |
| v. | | |
| | | DOCKET NO.: |
| BATH & BODY WORKS, INC., JOHN DOES | | |
| A-F (names being fictitious) and ABC | | Civil Action |
| CORPORATIONS 1-10 (names being fictitious) | | |
| jointly, severally and/or in the alternative, | | **COMPLAINT AND JURY DEMAND** |
| | Defendants | |

Plaintiff, DOLORES GRIECHEN residing at 48 Marlboro Avenue, Marlton, NJ 08053, by way of

Complaint against the defendant(s), states:

### FIRST COUNT

1. At all times relevant hereto, defendant, BATH & BODY WORKS, INC. is a limited liability

company with its principal place of business located at P.O. Box 182787, Columbus, OH 43218 that

maintained, managed, owned, leased, operated, controlled and/or possessed the property known as Bath &

Body Works located at 300 Route 73 South, Marlton, NJ 08053. Bath & Body Works, Inc. does business

in, and maintains locations in Camden County, New Jersey.

2. On or about January 8, 2021, plaintiff, DOLORES GRIECHEN, was an invitee, and tripped

and fell over an extension cord stretched across the floor that was concealed on the premises near the cash

register.

3. At all times relevant herein, defendant, BATH & BODY WORKS, INC. knew or should have

known that their premises were in a dangerous condition, containing unduly dangerous hazards as a result

of defendants and their agents, servants and/or employees failure to properly construct, maintain, inspect

and control said property.

4. At the aforesaid time and place, the agents, servants, and employees of defendant, BATH &

BODY WORKS, INC. were acting in their capacity as agents, servants and/or employees of the defendant,

so that the negligence, carelessness and recklessness of the agents, servants and employees may be imputed to the defendant, BATH & BODY WORKS, INC.

5.   Defendant, BATH & BODY WORKS, INC., jointly, severally and in the alternative, was negligent in that it failed to keep the premises in a safe condition, did not exercise proper care, caused a dangerous and hazardous condition to exist, allowed a nuisance to exist, failed to warn plaintiff of the hazardous condition, failed to provide proper safeguards and/or warnings on the property, failed to provide proper, safe and clear access for persons allowed and invited to use the property, failed to make proper inspection of their property and were otherwise negligent.

6.   As a result of the negligence of the defendant, BATH & BODY WORKS, INC., plaintiff did suffer and sustain severe and disabling injuries and has been and will in the future be caused to obtain medical treatment and has been and has been and will in the future be caused to refrain from her normal pursuits.

**WHEREFORE,** plaintiff, DOLORES GRIECHEN, demands judgment against the defendant, BATH & BODY WORKS, INC., for damages, interest, costs of suit and attorney's fees, jointly, severally and in the alternative.

**SECOND COUNT**

1.   Plaintiff repeats the allegations of the First Count as if same were set forth more fully at length herein and makes same a part hereof.

2.   The plaintiff alleges that an insufficient amount of time has passed within which to determine the actual identity of any other individual or entities who may own or operate the subject premises, be responsible for its maintenance, repair and safety practices, or be responsible in whole or in part for the causation of the aforesaid injuries and damages. For the purposes of the within Complaint, said individuals and entities have been nominated as JOHN DOES A-F (Fictitious Names) and ABC CORPORATIONS 1-10 (Fictitious Names), jointly, severally and/or in the alternative. The plaintiff, pursuant to the Rules of Court for the State of New Jersey, reserves the right to amend the within Complaint relative to these or other defendants when, and if, the identity of said individuals or entities become known.

2

**WHEREFORE**, plaintiff, DOLORES GRIECHEN, demands judgment against the defendants JOHN DOES A-F (Fictitious Names) and ABC CORPORATIONS 1-10 (Fictitious Names) jointly, severally and/or in the alternative on this Count for damages, interest, costs of suit and attorney's fees.

## DEMAND FOR INSURANCE INFORMATION

Pursuant to Rule 4:10(b), demand is hereby made that defendants disclose to plaintiff's attorney whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy part or all of a judgment and provide plaintiffs' attorneys with true copies of such insurance agreements or policies including, but not limited to any and all Declaration Sheets. This demand shall be deemed to include and cover not only primary coverage but also any and all excess, catastrophe and umbrella policies.

## DEMAND FOR ANSWERS TO INTERROGATORIES

**PLEASE TAKE NOTICE** that the plaintiff hereby demands of the defendants written answers to uniform Interrogatories within the time prescribed by the Rules of Court.

## JURY DEMAND

Plaintiff, DOLORES GRIECHEN, hereby demands a trial by a jury.

## CERTIFICATION PURSUANT TO R.4:5-1

Following my initial review of this matter, it appears that there are no other actions or arbitrations relating to this suit pending or presently contemplated. In addition, it appears that there are no other persons who should be joined as parties.

## DESIGNATION OF TRIAL COUNSEL

Richard DiTomaso, Esquire, the undersigned is hereby designated as trial counsel for Plaintiff, DOLORES GRIECHEN.

RICHARD DITOMASO, ESQUIRE
Counsel for Plaintiff, DOLORES GRIECHEN

Dated:   7. d l J l

3

# Civil Case Information Statement

### Case Details: CAMDEN | Civil Part Docket# L-002205-21

**Case Caption:** GRIECHEN DOLORES VS BATH & BODY
WORKS IN C.
**Case Initiation Date:** 07/21/2021
**Attorney Name:** RICHARD D DI TOMASO
**Firm Name:** DI-TOMASO LAW OFFICE
**Address:** 901 ROUTE 38 EAST
CHERRY HILL NJ 08002
**Phone:** 8564140010
**Name of Party:** PLAINTIFF : Griechen, Dolores
**Name of Defendant's Primary Insurance Company**
**(if known):** None

**Case Type:** PERSONAL INJURY
**Document Type:** Complaint with Jury Demand
**Jury Demand:** YES - 6 JURORS
**Is this a professional malpractice case?** NO
**Related cases pending:** NO
**If yes, list docket numbers:**
**Do you anticipate adding any parties (arising out of same
transaction or occurrence)?** NO

**Are sexual abuse claims alleged by: Dolores Griechen?** NO

### THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE
CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

Do parties have a current, past, or recurrent relationship? NO

If yes, is that relationship:

Does the statute governing this case provide for payment of fees by the losing party? NO

Use this space to alert the court to any special case characteristics that may warrant individual
management or accelerated disposition:

Do you or your client need any disability accommodations? NO
 If yes, please identify the requested accommodation:

Will an interpreter be needed? NO
 If yes, for what language:

Please check off each applicable category: Putative Class Action? NO  Title 59? NO  Consumer Fraud? NO

I certify that confidential personal identifiers have been redacted from documents now submitted to the
court, and will be redacted from all documents submitted in the future in accordance with *Rule* 1:38-7(b)

07/21/2021
Dated

/s/ RICHARD D DI TOMASO
Signed

# *EXHIBIT B*

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

DOLORES GRIECHEN,                         CASE NO.:

                              Plaintiff,         JUDGE

vs.

BATH & BODY WORKS, INC., JOHN
DOES A-F (names being fictitious) and ABC
CORPORATIONS 1-10 (names being
fictitious) jointly, severally and/or in the
alternative,

                              Defendants.
_____

**CERTIFICATION IN SUPPORT OF NOTICE OF REMOVAL**

I, LEAH A. BRNDJAR, certify as follows:

1.  I am an attorney of record for Defendant Bath & Body Works, LLC.

2.  On July 27, 2021, I participated in a teleconference with counsel for Plaintiff, Richard

    DiTomaso, wherein Mr. DiTomaso stated that Plaintiff was seeking damages in

    excess of $75,000, exclusive of costs, interest and attorney's fees.  Specifically, he

    stated that Plaintiff's damages exceed $1,500,000.

Executed this 20th day of August 2021

                                   _____
                                   Leah A. Brndjar (013132010)
                                   Goldberg Segalla
                                   301 Carnegie Center Drive, Suite 300
                                   Princeton, NJ 08540
                                   T: 609.986.1322
                                   F: 609.986.1301
                                   Attorney for Defendant

1

# *EXHIBIT C*

2016 WL 3921146
Only the Westlaw citation is currently available.
NOT FOR PUBLICATION
United States District Court, D. New Jersey.

Darryl DAVIS and Steven Grohs, Plaintiffs,

v.

Sherry YATES, Sarah Davis, New Jersey Department of Corrections, Sco John Doe, Defendants.

No. 15-cv-6943 (KM)(JBC)
|
Signed 07/20/2016

**Attorneys and Law Firms**

Darryl Davis, Avenel, NJ, pro se.

Steven Grohs, Avenel, NJ, pro se.

Ashley Gagnon, State of New Jersey, Trenton, NJ, for Defendants.

**MEMORANDUM OPINION**

KEVIN MCNULTY, U.S.D.J.

*\*1*  The plaintiffs, Dariyl Davis and Steven Grohs, brought this action for a declaratory judgment and to recover damages arising out of the alleged deprivation of rights under the Fourteenth Amendment to the United States Constitution and Article 1 of the New Jersey Constitution relating to the plaintiffs having been incarcerated in cold conditions. Plaintiffs filed their complaint against the New Jersey Department of Corrections ("NJDOC"), Sherry Yates and Sarah Davis (collectively, "Defendants") in the Superior Court of the State of New Jersey, Middlesex County, Law Division, on July 24, 2014. Defendants removed the action to this Court on September 18, 2015. (Dkt. No. 1) Now before the Court is Plaintiffs' motion to remand the action to state court pursuant to 28 U.S.C. § 1447 (Dkt. No. 3). [1] For the reasons set forth below, the motion to remand is denied.

Defendants removed this case pursuant to the federal removal statute, 28 U.S.C. § 1441. Under § 1441(a), a defendant may remove a civil action from the state court if the case could have been brought originally in federal court. Pursuant to 28 U.S.C. § 1331, a district court has original jurisdiction over cases that "arise under" federal law. [2] "[T]he party asserting federal jurisdiction in a removal case bears the burden of showing, at all stages of the litigation, that the case is properly before the federal court." *Frederico v. Home Depot*, 507 F.3d 188, 193 (3d Cir. 2007). Removal is strictly construed and all doubts are resolved in favor of remand. *See Samuel-Bassett v. Kia Motors Am., Inc.*, 357 F.3d 392, 396 (3d Cir. 2004).

The complaint in this action alleges violation of the Fourteenth Amendment to the United States Constitution and parallel rights under the New Jersey Constitution for the failure to provide proper heating and blankets to two incarcerated individuals. This matter therefore arises under this Court's federal question jurisdiction as it presents a case which arises under federal law. Of course, the plaintiff is master of his complaint, and a plaintiff may opt to sue in State court only under the State constitution. But that is not what plaintiffs have done here. In their state court complaint, they have asserted claims for violation of the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution.

Case 1:21-cv-15803-RBK-KMW   Document 1-1   Filed 08/20/21   Page 15 of 54 PageID: 19

Davis v. Yates, Not Reported in Fed. Supp. (2016)

**\*2**  Plaintiffs do not dispute that federal question jurisdiction exists. Instead, Plaintiffs contend that removal was not timely filed and that consent of all named defendants was not obtained prior to Defendants having filed the Notice of Removal.

Under 28 U.S.C. § 1446, a defendant has thirty days from the date of service in which to file a notice of removal. 28 U.S.C. § 1446(b). However, the statute also provides that

> If defendants are served at different times, and a later-served defendant files a notice of removal, any earlier-served defendant may consent to the removal even though that earlier-serviced defendant did not previously initiate or consent to removal.

28 U.S.C. § 1446(b)(2)(C). This rule is referred to as the "last served defendant rule." Under the "last served defendant" rule, the defendant which was served last may remove the entire case within thirty days of being served. *See, e.g., Gelber v. Kirsch,* 2015 WL 1471960, at \*8 (D.N.J. Mar. 30, 2015) (citations omitted). The last-served rule permits previously-served defendants to join in on removal, even if their own time to remove has expired. *See Delalla v. Hanover Ins.,* 660 F.3d 180, 188 (3d Cir. 2011); *DiLoreto v. Costigan,* 351 Fed.Appx. 747, 752 (3d Cir. 2009).

Here, Defendant Davis was served on August 12, 2015, and NJDOC was served on August 14, 2015. Defendant Yates was served on August 24, 2015. Notice of removal was filed on September 18, 2015, within thirty days of service on Yates. Under the last-served rule, therefore, removal was timely.

Furthermore, removal here satisfies the "rule of unanimity," whereby, in cases involving more than one defendant, all defendants are required to either join in the removal or to consent to removal. *See Levis v. Rego Co.,* 757 F.2d 66, 68 (3d Cir. 1985); 28 U.S.C. § 1446(b)(2)(A). Here, all served defendants are jointly represented and collectively filed the Notice of Removal. (*See* Dkt. No. 1) Accordingly, I find that the earlier-served defendants properly joined the removal. Plaintiffs object on the grounds that the fourth named defendant, "SCO John Doe," has not joined in removal. There is, however, no indication that this individual has been identified or served. "SCO John Doe" remains, at this stage, a fictitious entity. The unanimity rule may be disregarded where a non-joining defendant is an unknown or nominal party. *See, e.g., Doughtery, Clifford & Wadsworth, Corp. v. Magna Grp., Inc.,* 2007 WL 2579406, at \*3 (D.N.J. June 19, 2007) (citations omitted). Accordingly, because "SCO John Doe" has not been properly served in this action, the failure of that fictitious entity to join or consent to removal does not undermine the efficacy of the removal.

## CONCLUSION

I find that removal was timely filed and that all properly-served defendants joined in filing the Notice of Removal. Accordingly, I find removal proper and will deny the motion to remand. An appropriate order follows.

## All Citations

Not Reported in Fed. Supp., 2016 WL 3921146

**Davis v. Yates, Not Reported in Fed. Supp. (2016)**

---

## Footnotes

1    Due to confusion on the docket regarding whether Defendants had filed an opposition to the motion to remand, by
     Order dated June 10, 2016, the Court set forth a briefing schedule on the motion. (Dkt. No. 15) That order instructed
     Defendants to file an opposition to remand within 21 days of the order and afforded Plaintiffs 14 days thereafter to file a
     reply. On July 5, 2016, Defendants filed a letter indicating that they had previously filed an opposition (Dkt. No. 5) and
     stated that Defendants would rely on the arguments submitted therein. (Dkt. No. 16) Plaintiffs then filed a motion for
     sanctions and imposition of costs against Defendants, arguing that Defendants failed to respond to this Court's June 10,
     2016 Order and requesting remand as the appropriate remedy. (Dkt. No. 17) I find that Defendants properly responded to
     the June 10, 2016 Order by letter dated July 5, 2016. Accordingly, sanctions would be inappropriate and thus, Plaintiffs'
     motion for sanctions and imposition of costs is denied.

2    There is no contention that the parties are of diverse citizenship. *See* 28 U.S.C. § 1332.

---

**End of Document**                                         © 2021 Thomson Reuters. No claim to original U.S. Government Works.

---

*EXHIBIT D*

KeyCite Red Flag - Severe Negative Treatment

Disagreed With by   Estate of Ware v. Hospital of the University of Pennsylvania,   3rd Cir.(Pa.),   September 18, 2017

24 F.Supp.2d 325
United States District Court, D. New Jersey.

Pablo GILBERG, Plaintiff,

v.

STEPAN COMPANY, et al., Defendants.

No. Civ.A. 98–139(KSH).
|
Aug. 20, 1998.

## Synopsis

Former resident of environmentally contaminated community brought action in state court against manufacturer, alleging negligence, absolute liability, strict liability, trespass, nuisance, battery, per quod damages, millson, and intentional spoliation of evidence. After **removal**, former resident filed amended complaint and moved to remand for lack of subject matter jurisdiction. The District Court, Hedges, United States Magistrate Judge, held that: (1) diversity was complete at time of **removal**; (2) existence of indemnification agreement defining "the location" is necessary prerequisite to asserting cause of action under Price-Anderson Act; (3) federal jurisdiction did not exist under Price-Anderson Act; (4) manufacturer was not "federal agency" entitled to invoke federal defense under Federal Tort Claims Act (FTCA); and (5) assuming that jurisdiction was proper over spoliation of evidence claim, pursuant to federal officer **removal** statute, pendent jurisdiction could not be exercised over remaining state law claims.

Motion denied.

West Headnotes (29)

**[1]**   **Removal of Cases** ⬤═ Parties to notice or petition

**Removing** party is not required to obtain the consent of fraudulently joined, **fictitious**, or unserved parties. 28 U.S.C.A. § 1446.

2 Cases that cite this headnote

**[2]**   **Removal of Cases** ⬤═ Evidence

Burden of establishing the propriety of **removal** and the existence of subject matter jurisdiction falls on the **removing** party. 28 U.S.C.A. §§ 1446, 1447(c).

1 Cases that cite this headnote

**[3]**   **Removal of Cases** ⬤═ Constitutional and statutory provisions
**Removal of Cases** ⬤═ Evidence

**Removal** statutes are strictly construed against **removal** and all doubts should be resolved in favor of remand. 28 U.S.C.A. §§ 1441(a, b), 1446, 1447(c).

**[4]     Federal Courts** 🗝 Coplaintiffs and Codefendants;  Complete Diversity

Case falls within the federal district court's original diversity jurisdiction only if diversity of citizenship among the parties is "complete", that is, only if there is no plaintiff and no defendant who are citizens of the same state. 28 U.S.C.A. § 1332(a).

1 Cases that cite this headnote

**[5]     Removal of Cases** 🗝 Improper or collusive joinder of parties

Plaintiff cannot defeat **removal** merely by naming a nondiverse defendant; that defendant also has to be properly joined and served for **removal** to be barred. 28 U.S.C.A. §§ 1332(a), 1441(a, b), 1446, 1447(c).

2 Cases that cite this headnote

**[6]     Removal of Cases** 🗝 Citizenship of parties in general

**Removal of Cases** 🗝 Time of existence of ground of **removal**

Where only non-**fictitious** defendant named by former resident of environmentally contaminated community prior to **removal** of resident's New Jersey tort, nuisance, and trespass action was manufacturer that was incorporated in Delaware and had principal place of business in Illinois, diversity was complete at time of **removal**, and thus, jurisdiction was proper. 28 U.S.C.A. §§ 1332(a), 1441(a, b), 1446, 1447(c).

**[7]     Statutes** 🗝 Language

Statutory interpretation begins with the language of the statute itself.

**[8]     Statutes** 🗝 Plain language;  plain, ordinary, common, or literal meaning

**Statutes** 🗝 Plain language;  plain, ordinary, common, or literal meaning

Courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use, and if the statutory language is unambiguous, the plain meaning of the words ordinarily is regarded as conclusive.

1 Cases that cite this headnote

**[9]     Statutes** 🗝 Context

Meaning of statutory word cannot be determined in isolation, but must be drawn from the context in which it is used.

**[10]    Environmental Law** 🗝 Private right of action;  citizen suits

"Occurrence" which underlies a "nuclear incident" subject of public liability action under Price-Anderson Act can only be event at "the location" or "the contract location," as that term is defined in indemnity agreement entered into under Act. Atomic Energy Act of 1954, §§ 11(j, q), 170, as amended, 🏳 42 U.S.C.A. §§ 2014(j, q), 🏳 2210.

9 Cases that cite this headnote

[11]     **Environmental Law** 🔑 Private right of action;  citizen suits

Injuries alleged in residents' joint complaint against manufacturer concerning environmental contamination of property from radioactive thorium and thorium tailings produced in manufacturing process did not arise out of event at site of activity which was covered by Price-Anderson indemnification agreement, and thus, there was no "occurrence" that would constitute a "nuclear incident" necessary for public liability action under Price-Anderson Act. Atomic Energy Act of 1954, §§ 11(j, q), 170, as amended, 🏳 42 U.S.C.A. §§ 2014(j, q), 🏳 2210.

13 Cases that cite this headnote

[12]     **Environmental Law** 🔑 Private right of action;  citizen suits

Price-Anderson Act neither requires that nuclear source be used as intended nor requires that the escape or release of nuclear material be unintended, for public liability action to lie; what Act requires is that the escape or release occur in connection with indemnified activity. Atomic Energy Act of 1954, §§ 11(j, q), 170, as amended, 🏳 42 U.S.C.A. §§ 2014(j, q), 🏳 2210.

3 Cases that cite this headnote

[13]     **Environmental Law** 🔑 Medical and hospital devices and waste
          **Environmental Law** 🔑 Private right of action;  citizen suits

Production and application of radiopharmaceuticals is not an activity which would qualify for indemnification under Price-Anderson Act, as licenses for such activities are not subject to Act's financial protection requirements. Atomic Energy Act of 1954, §§ 11(j, q), 170, as amended, 🏳 42 U.S.C.A. §§ 2014(j, q), 🏳 2210.

2 Cases that cite this headnote

[14]     **United States** 🔑 Jurisdiction and venue

Original jurisdiction does not encompass would-be Federal Tort Claims Act (FTCA) claims which are asserted against federal agencies or employees. 28 U.S.C.A. §§ 1331, 🏳 1346(b)(1), 🏳 1441(a).

1 Cases that cite this headnote

[15]     **Federal Courts** 🔑 Defenses and anticipation thereof

Under the "well-pleaded complaint" rule, a claimant's cause of action does not "arise under" the laws of the United States merely because it might implicate a federal immunity defense. 28 U.S.C.A. § 1331.

[16]     **Removal of Cases** 🔑 Actions against or for acts of United States officers

Operation of federal officer **removal** statute is not limited by the well-pleaded complaint rule; rather, it is the raising of a federal question in the **removal** petition that constitutes the federal law under which the action arises. 28 U.S.C.A. § 1442(a).

---

**[17]**   **Removal of Cases** 🔑   Defects in proceedings, objections, amendments, and waiver

Imperfect or defective allegation is distinguished from a missing allegation, which may not be added by amendment after the 30-day period for **removal**. 📄 28 U.S.C.A. §§ 1446, 1653.

2 Cases that cite this headnote

---

**[18]**   **Removal of Cases** 🔑   Defects in proceedings, objections, amendments, and waiver

Manufacturer's mischaracterization of its Federal Tort Claims Act (FTCA) allegations in its notice of **removal** of residents' action concerning environmental contamination of property resulted in an "imperfect or defective" allegation, and thus, allegation could be amended after 30-day period for **removal**. 28 U.S.C.A. §§ 1442(a), 📄 1446, 1653.

2 Cases that cite this headnote

---

**[19]**   **Removal of Cases** 🔑   Actions against or for acts of United States officers

For **removal** to be proper under federal officer **removal** statute, a defendant must sufficiently allege that (1) it is a federal agency or federal officer, (2) that there exists a causal connection between the alleged conduct and the asserted official authority, and (3) that it has a colorable federal defense to the claim. 28 U.S.C.A. § 1442(a).

1 Cases that cite this headnote

---

**[20]**   **Removal of Cases** 🔑   In general;  service on adverse party and filing in state court

Defendant cannot establish that it was federal agency or employee by merely alleging in its notice of **removal**, under federal officer **removal** statute, that it was "agent or employee of the United States Government"; instead, notice must point to facts alleged in complaint, or aver facts or its own, which support finding that it was federal agency or employee. 28 U.S.C.A. § 1442(a).

1 Cases that cite this headnote

---

**[21]**   **United States** 🔑   Contractors in general;  strict control test

There are no sharp criteria for determining whether an entity is a "federal agency" within the meaning of the Federal Tort Claims Act (FTCA), but the critical factor is the existence of federal government control over the detailed physical performance and day to day operation of that entity. 📄 28 U.S.C.A. § 1346(b)(1).

1 Cases that cite this headnote

---

**[22]**   **Removal of Cases** 🔑   Actions against or for acts of United States officers
   **United States** 🔑   Particular Determinations

Manufacturer's predecessor was not "federal agency" within meaning of Federal Tort Claims Act (FTCA), and thus, manufacturer could not **remove** residents' tort, nuisance, and trespass action concerning environmental contamination

on basis that manufacturer was "federal agency" entitled to invoke federal defense under FTCA, even though Alien Property Custodian vested a 23% minority share in predecessor during World War II. 🔖 28 U.S.C.A. §§ 1346(b)(1), 1442(a).

1 Cases that cite this headnote

**[23]**    **Removal of Cases**  ☞  Actions against or for acts of United States officers

Federal officer **removal** statute authorizes **removal** of civil action when person acting under federal officer is sued in official or individual capacity for any act under color of such office, and this jurisdictional grant is limited only by restrictions placed on federal court jurisdiction by Article III of Federal Constitution. U.S.C.A. Const. Art. 3, § 2, cl. 1; 28 U.S.C.A. § 1442(a).

**[24]**    **Removal of Cases**  ☞  **Removal** of whole suit

When claim **removable** under federal officer **removal** statute is joined with additional, otherwise nonremovable state law claims, federal party **removing** federal claim can **remove** entire action if state law claims fall within pendent jurisdiction of federal courts. 28 U.S.C.A. § 1442(a)(1).

**[25]**    **Federal Courts**  ☞  Jurisdiction of Entire Controversy;  Pendent and Supplemental Jurisdiction

Existence of pendent jurisdiction over state law claims cannot be established by merely demonstrating presence of a viable, joined federal claim **removed** via federal officer **removal** statute; instead, (1) federal claim must have substance sufficient to confer subject matter jurisdiction on court, (2) state and federal claims must derive from common nucleus of operative facts, and (3) claims must be such that they would ordinarily be expected to be tried in one judicial proceeding. 28 U.S.C.A. § 1442(a)(1).

**[26]**    **Federal Courts**  ☞  Tort claims

Assuming that jurisdiction was proper over intentional spoliation of evidence claim asserted by former resident of environmentally contaminated community against manufacturer, pursuant to federal officer **removal** statute, pendent jurisdiction could not be exercised over resident's remaining state law claims for negligence, absolute liability, strict liability, trespass, nuisance, battery, per quod damages, and millison, as spoliation claim and remaining state claims did not derive from common nucleus of operative fact. 28 U.S.C.A. § 1442(a)(1).

**[27]**    **Federal Courts**  ☞  Jurisdiction of Entire Controversy;  Pendent and Supplemental Jurisdiction

When pendent jurisdiction extends to joined state-law claims, federal courts still retain discretion not to exercise it. 🔖 28 U.S.C.A. § 1367(c)(2).

**[28]**    **Federal Courts**  ☞  Effect of dismissal or other elimination of federal claims

If the claim on which federal jurisdiction was founded has been dismissed, the court may, in its discretion, dismiss the state law claims as well. 🔖 28 U.S.C.A. § 1367(c)(3).

**[29]    Federal Courts** 🔑 Coplaintiffs and Codefendants;  Complete Diversity

**Federal Courts** 🔑 Waiver, estoppel, and consent

Presence of nondiverse party automatically destroys diversity jurisdiction: no party can waive defect or consent to jurisdiction, and no court can ignore defect. 📄 28 U.S.C.A. § 1332(a).

**Attorneys and Law Firms**

**\*328** Christopher Michael Placitella, Wilentz, Goldman & Spitzer, Woodbridge, NJ, for Plaintiff.

Eric S. Aronson, Whitman, Breed, Abbott & Morgan, Newark, NJ, for Defendants.

*OPINION*

HEDGES, United States Magistrate Judge.

*INTRODUCTION*

This matter comes before me on plaintiffs motion to remand. I have considered the papers submitted in support of and in opposition to the motion. I heard oral argument on March 9, 1998.

*BACKGROUND*

From 1916 through 1956, the Maywood Chemical Works ("Maywood Chemical") manufactured iridescent gas mantles at a facility located in Maywood and Rochelle Park, New Jersey ("the facility"). As part of the manufacturing process Maywood Chemical "milled," or extracted, thorium, a radioactive metal, from monazite ore. One byproduct of thorium milling is "tailings," a sand-like residue similar in appearance to clay. Since it contains residual amounts of radioactive material in the state of decay, thorium tailings can present a substantial health hazard.

Maywood Chemical also conducted other manufacturing activities at the facility, including leather digestion, caffeine extraction, and the production of protein, lithium, aromatic chemical, and narcotic and flavor products. These operations also produced manufacturing waste. That waste was stored, along with Maywood Chemical's thorium tailings, in earthen-diked areas located on the facility's property. It is this mixed waste that forms the basis of this action, for it now appears that waste from the facility is responsible for radiological and chemical contamination of over 80 commercial and residential properties throughout the communities of Maywood, Lodi, and Rochelle Park, New Jersey.

It is alleged that the waste was conveyed into the surrounding communities by various means. Some waste is said to have migrated through Lodi Brook—which ran through the facility until it was replaced by a storm drainage system—and onto neighboring properties. Other waste is alleged to have been physically **removed** and transported to properties offsite for use as mulch, fill, and surface grade. Still other waste is said to have leached into ground and subsurface water, resulting in the contamination of eleven wells in Lodi, and the municipal pools of Lodi, Maywood and Rochelle Park. Finally, it is alleged that waste was used as fill when a section of Route 17 was constructed across a portion of the facility in 1932.

Plaintiff, a former resident of Lodi, claims that his real property and water supply were contaminated by waste from the facility. His action, which was commenced in the Superior Court of New Jersey, Middlesex County, on December 9, 1997, seeks recovery for injuries resulting from his personal exposure, and the exposure of his property, to these contaminants. Plaintiff is not alone. His attorneys represent over 400 present and former residents of Maywood, Lodi, and Rochelle Park, **\*329** who also contend that they, their relatives and/or their property were injured by exposure to waste from the facility. Indeed, when plaintiff's attorneys commenced his action in state court, they also filed 256 separate but similar actions on behalf of their other clients. Rather than submit 257 complaints, however, plaintiff's attorneys, with the approval of Middlesex County court officials, filed a single joint Complaint (the "Joint Complaint"), which was then adopted in whole or in part by the plaintiffs in each of the 257 actions (individual filing fees, totaling some $45,000 in the aggregate, were also paid).

The Joint Complaint is an unwieldy beast. Its 71 pages of captions (one for each of the 257 actions) fronts 101 pages of allegations and pleadings. Forty-six counts plead causes of action for negligence, absolute liability, strict liability, trespass, nuisance, battery, *per quod* damages, millson, wrongful death, consumer fraud, intentional spoliation of evidence, and punitive damages. Named defendants include Stepan Company ("Stepan"), which acquired Maywood Chemical and the facility in 1959, T.J. Gustenhoven Real Estate, Higgins Realtors, Gentry Realty Associates, Michael Tracey, and various **fictitious** entities and individuals. Not all defendants were named in every count, however, and not every count was adopted by plaintiff in the action *sub judice.* Only the causes of action for negligence, absolute liability, strict liability, trespass, nuisance, battery, *per quod,* millson, and intentional spoliation of evidence were adopted by plaintiff, and these were only alleged against Stepan and the various **fictitious** entities and individuals.

Stepan **removed** this action on January 7, 1998. [1] The Notice of **Removal** alleges that **removal** was proper on several grounds. The first is that plaintiff's claims are completely pre-empted by the exclusive cause of action for injuries arising out of "nuclear incidents" provided by the Price–Anderson provisions of the Atomic Energy Act of 1954, 42 U.S.C. § 2210. The second is that "at relevant times" Stepan was an agent or employee of the federal government and, therefore, plaintiff's claims fall under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1) & 2671–80. The third is that Stepan was a "person acting under" a federal officer in regard to the conduct which underlies plaintiff's claim for intentional spoliation of evidence, and, therefore, **removal** was proper under the Federal Officer **Removal** Statute, 28 U.S.C. § 1442(a)(1). The fourth and last basis for **removal** is that diversity of citizenship under 28 U.S.C. § 1332 exists between the parties.

 **[1]**   On February 6, 1998, plaintiff filed an Amended Complaint as of right under Rule 15(a). The Amended Complaint, which is a mere 16 pages in length, drops the claims for millson, *per quod,* and intentional spoliation of evidence. It also substitutes two real persons for **fictitious** defendants: Robert Vernieri, who is alleged to have been a hauler/transporter of the waste which was taken to properties offsite for use as mulch and fill, and John O'Brien, who is alleged to have been a Stepan plant manager who conspired to conceal Stepan's wrongful, contaminant-releasing activity from plaintiff. At the same time, plaintiff filed this motion to remand under 28 U.S.C. § 1447(c) for lack of subject matter jurisdiction. [2]

## *\*330  DISCUSSION*

 **[2]**    **[3]**   A **removed** action must be remanded "if at any time before final judgment it appears that the district court lacks subject matter jurisdiction." 28 U.S.C. § 1447(c). The burden of establishing the propriety of **removal** and the existence of subject matter jurisdiction falls on the **removing** party. *Boyer v. Snap–On Tools Corp.,* 913 F.2d 108, 111 (3d Cir.1990), *cert. denied,* 498 U.S. 1085, 111 S.Ct. 959, 112 L.Ed.2d 1046 (1991). Furthermore, **removal** statutes are "strictly construed against **removal** and all doubts should be resolved in favor of remand." *Steel Valley Auth. v. Union Switch and Signal Div.,* 809 F.2d 1006, 1010 (3d Cir.1987). With this standard in mind, I turn to Stepan's four asserted grounds upon which jurisdiction can rest.

*Diversity Jurisdiction.*

**[4]   [5]   [6]**   A defendant can **remove** from state court any civil action "of which the district courts of the United States have original jurisdiction." 28 U.S.C. § 1441(a) & (b). Under 28 U.S.C. § 1332(a), district courts have original jurisdiction over civil actions when there is diversity of citizenship between parties and the amount in controversy exceeds $75,000. However, "[a] case falls within the federal district court's 'original' diversity 'jurisdiction' only if diversity of citizenship among the parties is complete, *i.e.,* only if there is no plaintiff and no defendant who are citizens of the same State." *Wisconsin Dept. of Corrections v. Schacht,* 524 U.S. 381, ——, 118 S.Ct. 2047, 2052, 141 L.Ed.2d 364 (1998). At the same time, a plaintiff cannot defeat **removal** merely by naming a non-diverse defendant; that defendant also has to be "properly joined and served" for **removal** to be barred. § 1441(b), *see Schacht,* 524 U.S. at ——, 118 S.Ct. at 2053 (diversity measured by status of action and parties in state court at time of **removal**). Furthermore, for purposes of **removal** "the citizenship of defendants sued under **fictitious** names shall be disregarded." § 1441(a). Here, the only non-**fictitious** defendant named by plaintiff prior to **removal** was Stepan. Since it is uncontroverted that plaintiff is a citizen of New Jersey, Joint Complaint at 72, and that Stepan is a Delaware corporation with its principal place of business in Illinois, Joint Complaint at 97, diversity was complete at the time of **removal**. Jurisdiction, therefore, is proper under sections 1332 and 1441.

Unfortunately, that is not the end of the inquiry. The Amended Complaint plaintiff filed as of right after **removal** substituted Vernieri and O'Brien for two **fictitiously**-pled defendants. Plaintiff now claims that Vernieri and O'Brien are non-diverse and that this action must be remanded. Pursuant to 28 U.S.C. § 1447(e), a federal court can either permit the post-**removal** joinder of non-diverse, jurisdiction-destroying parties and remand, or it can deny their joinder and retain the action. Stepan argues that denial of joinder is the proper course since plaintiff has not averred sufficient facts to demonstrate that Vernieri and O'Brien are not fraudulently joined.

There is another problem, however, and it stands in the way of my resolving the section 1447(e) joinder issue. The Amended Complaint fails to allege the citizenship of Vernieri and O'Brien. I cannot make findings of fact as to citizenship when there are no facts on the issue of citizenship in the record. I need not concern myself with this dilemma, however, if I find that one of Stepan's other asserted grounds for jurisdiction is valid.

### The Price–Anderson Provisions of the Atomic Energy Act of 1954.

The Price–Anderson Act ("the Act"), 42 U.S.C. § 2210, vests district courts with original jurisdiction over "any public liability action arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n)(2). Moreover, the Act expressly authorizes **removal** by a defendant of any such action commenced in state court to the district court "in the district where the nuclear incident takes place." § 2210(n)(2). The Atomic Energy Act of 1954, as amended, 42 U.S.C. §§ 2011–2281, of which the Price–Anderson Act is but a section, defines "public liability action" as

> any suit asserting public liability. A public liability action shall be deemed to be an **\*331** action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section. [ 42 U.S.C. § 2014(hh)].

"Public liability," in turn, is defined as

any legal liability arising out of or resulting from a nuclear incident or precautionary evacuation (including all reasonable additional costs incurred by a State, or a political subdivision of a State, in the course of responding to a nuclear incident or a precautionary evacuation), except (i) claims under State or Federal workmen's compensation acts of employees of persons indemnified who are employed at the site of and in connection with the activity where the nuclear incident occurs; (ii) claims arising out of an act of war; and (iii) whenever used un 📁 subsections (a), 📁 (c), and 📁 (k) of section 2210 of this title, claims for loss of, or damages to, or loss of use of property which is located at the site of and used in connection with the licensed activity where the nuclear incident occurs. "Public liability" also includes damage to property of persons indemnified: *Provided,* That such property is covered under the terms of the financial protection required, except property which is located at the site of an used in connection with the activity where the nuclear incident occurs. [ 📁 42 U.S.C. § 2014(w)].

"Nuclear incident," is defined in relevant part as

any occurrence, including an extraordinary nuclear occurrence, within the United States causing, within or outside the United States, bodily injury, sickness, disease, or death, or loss of or damage to property, or loss of use of property, arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source, special nuclear, or byproduct material. [ 📁 42 U.S.C. § 2014(q)].

Since thorium falls within the definition of "source material," 📁 42 U.S.C. § 2014(z), and thorium tailings within the definition of "byproduct material," 📁 § 2014(e), Stepan argues that the claims asserted in the Joint Complaint assert legal liability arising out of an "occurrence ... causing ... bodily injury, sickness, [etc.,] arising out of or resulting from the radioactive, toxic, explosive or other hazardous properties of source ... or byproduct material." In short, Stepan argues that plaintiff pleads a public liability action properly **removable** under the Act.

Plaintiff, relying on 📁 *In re Cincinnati Radiation Lit.,* 874 F.Supp. 796 (S.D.Ohio 1995),[3] contends that for there to be an "occurrence," as that word is used in the definition of "nuclear incident," there must be an unintended release of radioactive material. The Joint Complaint, plaintiff argues, alleges only intentional releases of thorium, and thorium tailings, and thus the Act does not apply. Stepan counters that under the plain language of the Act, the intentional/unintentional distinction plaintiff relies upon is "spurious." The resolution of the issue, therefore, would appear to turn on the proper construction of "occurrence" as utilized in the definition of "nuclear incident."

 **[7]**    **[8]**   "[I]t is axiomatic that statutory interpretation begins with the language of the statute itself. Courts presume that Congress expressed its legislative intent through the ordinary meaning of the words it chose to use, and if the statutory language is unambiguous,   **\*332**  the plain meaning of the words ordinarily is regarded as conclusive." *In re TMI,* 67 F.3d 1119, 1123 (3d Cir.1995) (citation omitted) (quoting 📁 *Government of Virgin Islands v. Knight,* 989 F.2d 619, 633 (3d Cir.1993)), *cert. denied,* 510 U.S. 994, 114 S.Ct. 556, 126 L.Ed.2d 457 (1993), *cert. denied sub nom. Metropolitan Edison v. Dodson,* 517 U.S. 1163, 116 S.Ct. 1560, 134 L.Ed.2d 660 (1996). Taken in isolation, the word "occurrence" conveys a broad meaning. Webster, for example, defines occurrence as "something that takes place" or "the action or process of happening or taking place." *Webster's*

*New International Dictionary* 1561 (3d ed.1976). Random House defines it as "the action, fact or instance of occurring" and "something that happens; [an] event [or] incident." *Random House Dictionary of the English Language* 1340 (2d ed.1987).

 **[9]**    However, "it is a fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation. but must be drawn from the context in which it is used." *Textron Lycoming Reciprocating Engine Div. v. United Auto., Aerospace and Agric. Implement Workers of Am.,* 523 U.S. 653, ——, 118 S.Ct. 1626, 1629, 140 L.Ed.2d 863 (1998) (*quoting* *Deal v. United States,* 508 U.S. 129, 132, 113 S.Ct. 1993, 124 L.Ed.2d 44 (1993)).  In this regard, it is significant that the definition of nuclear incident employs "occurrence" in concert with the clause "including an extraordinary nuclear occurrence," so as to read, "[t]he term 'nuclear incident' means any occurrence, including an extraordinary nuclear occurrence." § 2014(q). The phrase extraordinary nuclear occurrence is statutorily defined:

> [t]he term "extraordinary nuclear occurrence" means any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines to be substantial, and which the Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, determines has resulted or will probably result in substantial damages to persons offsite or property offsite.... As used in this subsection, "offsite" means away from "the location" or "the contract location" as defined in the applicable Nuclear Regulatory Commission or the Secretary of Energy, as appropriate, indemnity agreement, entered into pursuant to section 2210 of this title.
>
> [ 42 U.S.C. § 2014(j)].

An occurrence which underlies the definition of "extraordinary nuclear occurrence" cannot be just "any event," but can only be an event at 'the location' or 'the contract location' as those terms are defined "in the applicable ... indemnity agreement." § 2014(j).

 **[10]**    The proximity to and interrelationship between the word "occurrence" and the phrase "extraordinary nuclear occurrence," in turn, "presents a classic case for application of the 'normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.' " *Commissioner v. Lundy,* 516 U.S. 235, ——, 116 S.Ct. 647, 133 L.Ed.2d 611 (1996) (*quoting* *Sullivan v. Stroop,* 496 U.S. 478, 484, 110 S.Ct. 2499, 110 L.Ed.2d 438 (1990)); *United States v. Nippon Paper Ind. Co., Ltd.,* 109 F.3d 1, 4 (1st Cir.1997), *cert. denied,* 522 U.S. 1044, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998). As a matter of statutory construction, therefore, the occurrence which underlies a "nuclear incident," can only be an event at "the location" or "the contract location" as that term is defined in an indemnity agreement entered into under § 2210. Such a construction also makes eminent sense in light of Price–Anderson's statutory framework. To understand that framework, and to understand why the existence of an indemnification agreement defining "the location" is a necessary prerequisite to asserting a cause of action under Price–Anderson, requires a discussion of the history behind Price–Anderson's enactment and amendment.

The history behind Price–Anderson begins with the passage of Atomic Energy Act of 1946, ch. 724, 60 Stat. 755 (1946), which "contemplated that the development of nuclear power would be a Government monopoly." **\*333** *Duke Power Co. v. Carolina Environ. Study Group, Inc.,* 438 U.S. 59, 63, 98 S.Ct. 2620, 57 L.Ed.2d 595 (1978). Soon after the passage of the 1946 Act Congress recognized, "that it would be in the national interest to permit private sector involvement in [the nuclear] industry under a system of federal licensing and regulation." *In re TMI Lit. Cases Consol. II,* 940 F.2d 832, 852 (3d Cir.1991),

*cert. denied sub nom. Gumby v. General Pub. Util. Corp.,* 503 U.S. 906, 112 S.Ct. 1262, 117 L.Ed.2d 491 (1992) ("TMI II"). Congress thus enacted the Atomic Energy Act of 1954 ("AEA"), 68 Stat. 919 (1954) (codified as amended at 42 U.S.C. §§ 2011–2281), which provided for the "licensing of private construction, ownership, and operation of commercial nuclear power reactors for energy production under strict supervision by the Atomic Energy 🔖 Commission (AEC)." *Duke Power,* 438 U.S. at 63, 98 S.Ct. 2620; *see* 🔖 42 U.S.C. §§ 2133, 🔖 2134 & 🔖 2235.

Private industry, however, viewed the opportunity to participate in this young field with guarded concern, for "[i]t soon became apparent that profits from the private exploitation of atomic energy were uncertain and the accompanying risks substantial." 🔖 *Duke Power,* 438 U.S. at 63–64, 98 S.Ct. 2620. As the Supreme Court explained,

> [a]lthough the AEC offered incentives to encourage investment, there remained in the path of the private nuclear power industry various problems—the risk of potentially vast liability in the event of a nuclear accident of a sizable magnitude being the major obstacle. Notwithstanding comprehensive testing and study, the uniqueness of this form of energy production made it impossible totally to rule out the risk of a major nuclear accident resulting in extensive damage. Private industry and the AEC were confident that such a disaster would not occur, but the very uniqueness of nuclear power meant that the possibility remained, and the potential liability dwarfed the ability of the industry and private insurance companies to absorb the risk. [ 🔖 438 U.S. at 64, 98 S.Ct. 2620].

Indeed, the risks were substantial enough that "spokesmen for the private section informed Congress that they would be forced to withdraw from the field if their liability were not limited by appropriate legislation." 🔖 438 U.S. at 64, 98 S.Ct. 2620.

In 1957, Congress responded by enacting the Price–Anderson Act, Pub.L. No. 85–256, 71 Stat. 576 (1957) (codified as amended at 🔖 42 U.S.C. § 2210 (1996)), for the purpose of "protect[ing] the public and ... encourag[ing] the development of the atomic energy industry." 🔖 ⚠️*TMI II,* 940 F.2d at 852 (*quoting* 42 U.S.C. § 2012). Price–Anderson mandated that an assured "pool" of available funds be established to cover certain liabilities which might arise out of activities related to licenses issued under the AEA for the construction and operation of nuclear power plants. For each such license, the pool was constituted in the following manner: The first-tier contributor to the pool was the licensee, which was required as a condition of its license to maintain "financial protection," [4] consisting of either "private insurance, private contractual indemnities, self insurance, [or] other proof of financial responsibility." Price–Anderson Act, sec. 4, §§ 170(a) & (b) (codified as amended at 🔖 §§ 2210(a) & 🔖 (b)), *reprinted in* 1957 U.S.C.C.A.N. 629, 630. The amount of financial protection the licensee was required to carry was set by AEC regulation, although the benchmark was "the amount of liability insurance available from private sources." Price–Anderson Act, sec. 4, § 170(b), *reprinted in* 1957 U.S.C.C.A.N. at 630.

The second-tier contributor was the AEC itself. It was required to enter into an indemnification agreement with any licensee who was required by license to maintain financial protection. Price–Anderson Act, sec. 4, § 170(c) (codified as amended at 🔖 § 2210(c)), *reprinted in* 1957 U.S.C.C.A.N. at 630–31. [5] The indemnification agreement was **\*334** required to provide, in turn, that in the event the amount of financial protection held by the licensee became exhausted by liability for damages arising from an accident, the AEC would step in and contribute an additional $500 million to cover the liability that remained. Once both the licensee's financial protection and the AEC indemnification were exhausted, Price–Anderson provided for a "limitation of liability" that capped the remaining liability flowing from an accident. Price–Anderson Act, sec. 4, § 170(e) (codified as amended at 🔖 § 2210(e)), *reprinted in* 1957 U.S.C.C.A.N. at 631.

Licenses for the construction and operation of nuclear power facilities, however, were not the only licenses authorized under the AEA. The AEA also authorized the AEC to license the production and possession of nuclear materials, such as source, special nuclear, [6] and byproduct materials. *See* 42 U.S.C. §§ 2073, 2093 & 2111. While Price–Anderson did not mandate, as it did with plant licenses, that assured pools of coverage be established and maintained in regard to liabilities arising from activities involving these materials licenses, it did provide that the AEC could subject materials licences to Price–Anderson at AEC's discretion. Price–Anderson Act, sec. 4, § 170(a), *reprinted in* 1957 U.S.C.C.A.N. at 630. [7]  In granting the AEC this discretion, however, Congress warned that

> [i]t is not expected that ordinarily the Commission will use the authority given it with respect to these ... three types of materials. However, there may be rare instances in which the licensee, without at the same time being a licensee of a facility, may have such large quantities of materials or such quantities of especially dangerous or hazardous materials as to warrant the imposition of the provisions of this bill. [S.Rep. No. 85–296 (1957), *reprinted in* 1957 U.S.C.C.A.N. 1803, 1820].

Price–Anderson also added four definitions, along with that for "financial protection," to the AEA. Together, the four defined phrases served to identify which persons were entitled to claim against, and which claims were compensable from, a Price–Anderson pool of assured funds. First, the Act defined the phrase "licensed activity" to mean "an activity licensed pursuant to [the AEA] and covered by the provisions of section 170a [requiring the maintenance of financial protection]." Price–Anderson Act, sec. 3, § 11(n) (codified as amended at 42 U.S.C. § 2014(p)), *reprinted in* 1957 U.S.C.C.A.N. at 629; S.Rep. No. 85–296, *reprinted in* 1957 U.S.C.C.A.N. at 1817 (" 'licenced activity' ... means any activity for which a license is issued ... but for which the Commission requires financial protection under section 170a"). It was these activities which Congress or the AEC identified as carrying the risk of potentially wide-ranging liability which the pool of assured funds was intended to insure against.

Next, the phrase "nuclear incident" pinpointed the "event" that would arise out of, or be connected with, the licensed activity and lead to the extensive liability-generating injuries Price–Anderson was intended to address. "Nuclear incident" was defined to mean

> any occurrence within the United States causing bodily injury, sickness, disease, or death, or loss of or damage to property, or for loss of use of property, arising out of or resulting from the radioactive, toxic, explosive, or other hazardous properties of source, special nuclear, or byproduct material. [Price–Anderson Act, sec. 3, § 11(*o*) (codified as amended at 42 U.S.C. § 2014(q)), *reprinted in* 1957 U.S.C.C.A.N. at 629].

As the Senate Report accompanying the Price–Anderson Act explained, "[t]he occurrence  **\*335**  which is the subject of this definition is that event at the site of the licensed activity, or activity for which the Commission has entered into a contract, which may cause damage." S.Rep. No. 85–296, *reprinted in* 1957 U.S.C.C.A.N. at 1817. [8]

In turn, the phrase "public liability" identified the types of claims arising from a nuclear incident that would qualify to be compensated from the pool of financial protection and indemnification funds:

> The term 'public liability' means any legal liability arising out of or resulting from a nuclear incident, except claims under State or Federal Workmen's Compensation Acts of employees of persons indemnified who are employed at the site of and in connection with the activity where the nuclear incident occurs, and except for claims arising out of an act of war. 'Public liability' also includes damage to property of

persons indemnified: *Provided,* That such property is covered under the terms of the financial protection required, except property which is located at the site of and used in connection with the activity where the nuclear incident occurs. [Price–Anderson Act. sec. 3, § 11(u) (codified as amended at 42 U.S.C. § 2014(w)), *reprinted in* 1957 U.S.C.C.A.N. at 629–30].

The definition of public liability was drawn broadly to assure that members of the public were afforded compensation for injuries arising out of a nuclear incident. A proposal which would have excluded coverage under the Act for injuries resulting from a nuclear incident wilfully caused was rejected. As the Senate Report explained, "[t]he suggestion ... that willful damages be excluded was not accepted since the damage to the public is the same, whether caused by any means—willful or nonwillful." S.Rep. No. 85–296, *reprinted in* 1957 U.S.C.C.A.N. at 1819. [9]

Moreover, to constitute a claim for public liability it was not necessary that the liability be that of the person who held the license for the activity out of which the nuclear incident arose. The pool of assured funds associated with a licensed activity covered any liability of any person arising out of a nuclear incident. The "channeling" of all liability to the fund was assured by two mechanisms. First, the provisions of the insurance policies maintained by the licensee as financial protection assured that the policy ran to the benefit of "any other person who may be liable for a nuclear incident." S. Rep. No. 85–296, *reprinted in* 1957 U.S.C.C.A.N. at 1811–12. Second, the Act required that AEC indemnity agreements provide for the indemnification of all "persons indemnified," a phrase the AEA defined to mean "the person with whom an indemnity agreement is executed and any other person who may be liable for public liability." Price–Anderson Act, sec. 3, § 11(r) (codified as amended at 42 U.S.C. § 2014(t)), *reprinted in* 1957 U.S.C.C.A.N. at 629; S.Rep. 85–296, *reprinted in* 1957 U.S.C.C.A.N. at 1818–19. Price–Anderson guaranteed that compensation would be available to the public regardless of fault and that no legitimate claim would be uncompensated due to the insolvency of a defendant.

One of the significant features of the original Price–Anderson Act was the limited role it envisioned the federal courts would play in the enforcement of the Act's provisions. Although the Act identified, through the phrase "public liability," the realm of claims which were compensable out of Price–Anderson funds, it did not originally create a federal cause of action or provide a federal forum for the resolution of such claims. *See Kiick v. Metropolitan Edison Co.,* 784 F.2d 490, 492–94 (3d Cir.1986); *Stibitz v. General Public Utilities Corp.,* 746 F.2d 993, 996–97 (3d Cir.1984), *cert. denied,* 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985). Instead, **\*336** liability and the measure of damages for claims arising from nuclear incidents was to be determined by state law, and jurisdiction to decide the such claims remained, by default, in the hands of the state courts. *Kiick,* 784 F.2d at 493–94 ("[u]nder the Price–Anderson system, the claimant's right to recover from the fund established by the act is left to the tort law of the various States") (*quoting* S.Rep. No. 89–1605 (1966), *reprinted in* 1966 U.S.C.C.A.N. 3201, 3206).

However, the Act did provide for one narrow aspect of federal jurisdiction: The AEC or any person indemnified could apply to a district court for an appropriate order enforcing the limitation of liability, upon a showing "[t]hat the public liability from a single nuclear incident will probably exceed the limit of liability imposed by [the Act]." Price–Anderson Act, sec. 4, § 170(e), *reprinted in* 1957 U.S.C.C.A.N. at 631. [10] As the Senate Report explained, "[b]y this procedure the right of the State courts to establish the liability of the persons involved in the normal way is maintained, but the payment of those liabilities can be stayed [when the limit of liability is likely to be exceeded]. This will permit a payment to all persons who suffer damage on a prorated basis and it will not permit full payment to the first claimants with no payment to the last claimants." S. Rep. No. 85–296, *reprinted in* 1957 U.S.C.C.A.N. at 1823–24.

Fifty years after Price–Anderson's enactment, the basic framework of the insurance/indemnification, limitation of liability, and compensation scheme remains. At the same time, Congress has made several significant alterations. For example, the Act now permits the Nuclear Regulatory Commission ("NRC") [11] to exempt any nonprofit educational institution wishing to obtain a

license to construct and operate a reactor for educational purposes from the Act's financial protection requirements. *See* 42 U.S.C. § 2210(k). Despite granting such an exemption, however, the NRC is still required to indemnify the institution for public liability in excess of $250,000, up to a limit of $500 million. § 2210(k)(1). Congress also reorganized the pool pay-in structure for licenses to operate large, commercial power-generating reactors. *See* 1975 Amendment to the Atomic Energy Act of 1954, Pub.L. No. 94–197, secs. 2–7, § 170(a)–(f), 89 Stat. 1111 (1975) (codified as amended at 42 U.S.C. § 2210(a)–(f)). The reorganization was prompted by congressional recognition that the industry had matured to the point where it could begin to assume more of the liabilities associated with a potential nuclear incident. S.Rep. No. 94–454, at 10 (1975), *reprinted in* 1975 U.S.C.C.A.N. 2251, 2259–60; *see* Duke Power, 438 U.S. at 66–67, 98 S.Ct. 2620 (discussing 1975 Amendment). The industry's ability to maintain progressively higher amounts of financial protection also prompted an adjustment to the limitation of liability provision: Damages are now capped at the greater of $560 million or the amount of financial protection carried by the licensee. § 2210(e).

The changes to Price–Anderson which are most relevant here, however, are those which expanded, first in 1966 and again in 1988, the jurisdiction granted the federal courts with regard to claims for public liability. The 1966 amendment grew out of congressional concern that, under the 1957 provisions, two different victims of a serious nuclear incident "might be subject to different substantive and procedural laws ... simply by reason of an invisible State boundary line that separates **\*337** them." S.Rep. No. 89–1605, *reprinted in* 1966 U.S.C.C.A.N. at 3208. In particular, Congress was concerned that "there was no assurance that all State courts would impose a rule of strict liability in the event of a [serious] nuclear incident. Because of his inability to prove negligence the victim in such a case might, therefore, go without compensation for his injury or damage." Sen. R. No. 89–1605, *reprinted in* 1966 U.S.C.C.A.N. at 3203–04; *see* Duke Power, 438 U.S. at 64, 98 S.Ct. 2620. Nor, for that matter, did all state statutes of limitations account for the delayed manifestation of radiation injuries. S.Rep. No. 89–1605, *reprinted in* 1966 U.S.C.C.A.N. at 3208.

The solution Congress devised amended Price–Anderson to provide that certain defenses of persons indemnified would be waived in the case of a serious nuclear incident. The AEC was authorized to require indemnification agreements with licensees and contractors and insurance policies or contracts furnished as proof of financial protection to incorporate provisions

> which waive (i) any issue or defense as to conduct of the claimant or fault of persons indemnified, (ii) any issue or defense as to charitable or governmental immunity, and (iii) any issue or defense based on any statute of limitations if suit is instituted within three years from the date on which the claimant first knew, or reasonably could have known, of his injury or damage and the cause thereof, but in no event more than ten years after the date of the nuclear incident. 1966 Amendment to the Atomic Energy Act of 1954, Pub.L. 89–645, sec. 3, § 170(n)(1), 80 Stat. 891 (codified as amended at 42 U.S.C. § 2210(n)(1)), *reprinted in* 1966 U.S.C.C.A.N. 1052, 1054].

By this method, Congress could assure uniformity in key aspects of tort law, while preserving "the approach followed in enacting the original Price–Anderson Act—namely, interfering with State law to the minimum extent necessary." S. Rep. No. 89–1605, *reprinted in* 1966 U.S.C.C.A.N. at 3209.

As noted, Congress intended the contractual waivers of defenses to apply only in the case of a serious nuclear incident. To this end, the 1966 Amendment defined a new phrase, "extraordinary nuclear occurrence," which delineated the class of occurrences that would trigger application of the waivers. S.Rep. No. 89–1605, *reprinted in* 1966 U.S.C.C.A.N. at 3210–12 (threshold triggering waiver provisions "is identified by the term 'extraordinary nuclear occurrence' "). The new definition provided:

> [t]he term 'extraordinary nuclear occurrence' means any event causing a discharge or dispersal of source, special nuclear, or byproduct material from its intended place of confinement in amounts offsite, or causing radiation levels offsite, which the Commission determines to be substantial, and which the Commission determines has resulted or will probably result in substantial damages to persons offsite or property offsite.... As used in this subsection, 'offsite' means away from 'the location' or 'the contract location' as defined in the applicable Commission indemnity agreement, entered into pursuant to section 170. [1966 Amendment, sec. 1(a)(1), § 11(j), (codified as amended at 42 U.S.C. § 20140), *reprinted in* 1966 U.S.C.C.A.N. 1052–53].

The amendment also incorporated the new phrase into the definition of "nuclear incident" so as to assure that claims arising from an extraordinary nuclear occurrence ("ENO") were recognized as compensable from Price–Anderson funds. 1966 Amendment, sec. 1(a)(4), § 170(q) (codified as amended at 42 U.S.C. § 2014(q)), *reprinted in* 1966 U.S.C.C.A.N. at 1053 (inserting the phrase "including an extraordinary nuclear occurrence," after the phrase "[t]he term 'nuclear incident' means any occurrence"). As the Senate Report to the 1966 Amendment explained,

> [b]ecause subsections [2210(c) and (d) ] provide that the Commission shall agree to indemnify for public liability arising from "nuclear incidents," this addition to the definition of "nuclear incident" makes clear that indemnity may be paid for liability arising out of extraordinary nuclear occurrences which, in fact, do cause the kind of injury or damage referred to in the definition of "nuclear incident." [ **\*338** S.Rep. No. 89–1605, *reprinted in* 1966 U.S.C.C.A.N. at 3224].

To further assure that all victims of an ENO received uniform and equitable treatment under the Act, Congress also added a provision which vested the district court where the ENO took place with original jurisdiction over "any public liability action arising out of or resulting from [that] extraordinary nuclear occurrence." 1966 Amendment, sec. 3, § 170(n)(2) (codified as amended at 42 U.S.C. § 2210(n)(2)), *reprinted in* 1966 U.S.C.C.A.N. at 1054–55. This provision also permitted (but did not require) the **removal** from state court of any ENO-related claim for public liability, as well as for the transfer of all such claims from district courts without proper venue. *See* S. Rep. No. 89–1605. *reprinted in* 1966 U.S.C.C.A.N. at 3214–15. As for public liability claims which arose out of mere (non-extraordinary) occurrences, Congress retained the original structure of Price–Anderson; thus, federal courts could intervene in the disposition of non-extraordinary claims only when it appeared likely that the limitation of liability under Price–Anderson was going to be exceeded.

It was the claims experience arising out of the March, 1979 accident at the Three–Mile Island ("TMI") nuclear reactor facility which prompted Congress in 1988 to further expand federal jurisdiction to include public liability claims for nuclear incidents arising out of *all* occurrences. The TMI accident generated in excess of 150 separate cases, filed in various state and federal courts, asserting "public liability" claims on behalf of over 3,000 claimants. S.Rep. No. 100–218, at 13 (1987), *reprinted in* 1988 U.S.C.C.A.N. 1476, 1488. However, since the NRC had determined that no event underlying the TMI incident constituted an ENO, no district court had federal question jurisdiction to hear the claims.[12] *Kiick,* 784 F.2d at 494–96. As a result, the provisions of Price–Anderson which allowed for the consolidation of ENO-related claims in one federal court were unavailable to defendants named in the TMI cases, and each case had to proceed separately in the jurisdiction in which it was commenced.

It was the inefficiency which resulted from having TMI claims determined separately by courts in different states which led Congress to create federal jurisdiction over all "public liability actions arising out of or resulting from a nuclear incident." 42 U.S.C. § 2210(n)(2). As the Third Circuit explained:

> The decision to expand the jurisdictional grant was based upon the fact that the experience with claims following the TMI accident demonstrated the advantages of the ability to consolidate claims after the nuclear incident. Attorneys representing both plaintiffs and defendants in the TMI litigations testified ... that the ability to consolidate claims in federal court would greatly benefit the process for determining compensation for claimants.... The availability of the provisions for consolidation of claims in the event of any nuclear incident ... would avoid the inefficiencies resulting from duplicative determinations of similar issues in multiple jurisdictions that may occur in the absence of consolidation. [ *TMI II,* 940 F.2d at 853 n. 18 (*quoting* S. Rep. No. 100–218, *reprinted in* 1988 U.S.C.C.A.N. at 1488) ].

Congress made two amendments to Price–Anderson to effect the change in jurisdiction. First, it added yet another definition to the AEA, that for the phrase "public liability action." Price–Anderson Amendments Act of 1988 ("Amendments Act"), Pub.L. 100–408, sec. 11(b), § 11(hh), 102 Stat. 1066, 1076 (codified at 42 U.S.C. § 2014(hh)). The definition provided that,

> [t]he term "public liability action", as used in section 2210 of this title, means any suit asserting public liability. A public liability action shall be deemed to be an action arising under section 2210 of this title, and the substantive rules for decision in such action shall be derived from the law of the State in which the nuclear incident involved occurs, unless such law is inconsistent with the provisions of such section. [ 42 U.S.C. § 2014(hh) ].

**\*339** The new definition had the effect of creating a federal cause of action under the Act for public liability claims arising out of a nuclear incident. *TMI II,* 940 F.2d at 857.[13] This federal cause of action also effectively preempted any state cause of action previously available to remedy the same wrong. *TMI II,* 940 F.2d at 854–55. The new definition did not, however, work an expansion in the universe of claims which were compensable out of Price–Anderson funds.[14]

The Amendments Act next substituted the phrase "nuclear incident" for the phrase "extraordinary nuclear occurrence" in the Act's jurisdictional provision. Amendments Act, sec. 11, § 170(n)(2), 102 Stat., at 1076 (codified at 42 U.S.C. § 2210(n)(2)). As amended, the provision stated that "[w]ith respect to any public liability action arising out of or resulting from a nuclear incident, the United States district court in the district where the nuclear incident takes place ... shall have original jurisdiction." § 2210(n)(2).[15] The Third Circuit characterized the change as follows:

> The Amendments Act creates a federal cause of action which did not exist prior to the Act, establishes federal jurisdiction for that cause of action, and channels all legal liability to the federal courts through that cause of action. By creating this federal program which requires the application of federal law, Congress sought to effect uniformity, equity, and efficiency in the disposition of public liability claims. With the federal jurisdiction and **removal** provisions set forth in the Amendments Act, Congress ensured that all claims resulting from a given nuclear incident would be governed by the same law, provided

for the coordination of all phases of litigation and the orderly distribution of funds, an assured the preservation of sufficient funds for victims whose injuries may not become manifest until long after the incident.... Thus, Congress clearly intended to supplant all possible state causes of action when the factual prerequisite of the statute are met. [ *TMI II,* 940 F.2d at 856–57 (citation omitted) ].

**[11]**   With that background in place, the issue before me is crystal clear: Do the injuries alleged in the Joint Complaint arise out of an event at the site of activity which is covered by a Price–Anderson indemnification agreement? The answer is no. While it is true that any thorium or thorium tailings at the facility may have been the subject of AEC or NRC licenses for source and/ or byproduct materials, *see* Aronson Cert., Ex. H (Source Material License No. R–103, issued to Maywood Chemical Works on April 1, 1954) & Ex. I (Source Material License No. STC–130 Source Material License No. STC–130, issued to Maywood Chemical **\*340**  Works Division of Stepan Chemical Co. on March 7, 1961); DeCarlo Cert., Ex. D (Materials License No. STC–1333 Materials License No. STC–1333, Amend. No. 3, issued to Stepan Chemical Company on November 5, 1987), licenses for these types of materials have never been subject to Price–Anderson's financial protection provisions. [16]   Therefore, neither the AEC nor the NRC would have entered into an indemnification agreement covering activity conducted under such licenses. [17]

In the absence of an indemnification agreement, entered into under 42 U.S.C. § 2210 and covering the activities which gave rise to the liability alleged, there can be no "occurrence," that is, no event at the site of "licensed activity," that would constitute a "nuclear incident." Without a nuclear incident, there is no claim for public liability, and without a claim for public liability, there is no federal jurisdiction under Price–Anderson.

Admittedly, the path to this result is not entirely self-evident, and, as a result, the few reported opinions which have confronted the issue have reached inconsistent and, I believe, incorrect results. Take, for example, *In re Cincinnati,* the decision relied upon by plaintiff for the proposition that a release must be unintentional to constitute an occurrence. Although *In re Cincinnati* reached the correct result—it found there had been no occurrence under the Act—it did so for the wrong reasons. *In re Cincinnati* recognized that in 1988 Congress had considered, and rejected, a proposal to make licenses covering radiopharmaceuticals (the materials involved in that case) among those "license[s] [that] shall ... have as a condition of the license a requirement that the licensee have and maintain financial protection." § 2210(a); *see* 874 F.Supp. at 832 n. 33; S.Rep. No. 100–218, at 8–9, *reprinted in,* 1988 U.S.C.C.A.N. at 1483–84. In rejecting this proposal, Congress noted that the NRC already possessed the discretion to subject such licenses to the requirements of the Act and had declined to do so. H.R.Rep. No. 100–104, pt. 1 H.R.Rep. No. 100–104, pt. 1, at 19–20. Congress did, however, direct the NRC to reconsider this decision through a negotiated rulemaking proceeding. That proceeding, in turn, produced a recommendation, adopted by the NRC, that the requirements of the Act not be extended. 54 Fed.Reg. 22444 (1989) (termination of rulemaking proceeding).

**[12]**   **[13]**   *In re Cincinnati* recognized that "Congress was pressured to extend the boundaries of the Act to nuclear medicine, and specifically declined to do so." 874 F.Supp. at 832. However, the court failed to recognize the exact implication, within the framework of the Act, of that decision. Instead, *In re Cincinnati* concluded that "in this case, the nuclear source at issue was employed as intended and cannot give rise to a claim under the Price–Anderson Act. Moreover, liability under the Price–Anderson Act turns on the existence of a 'nuclear incident,' which does not occur when there is no unintended escape or release of nuclear energy." 874 F.Supp. at 832. Price–Anderson, however, neither requires that a nuclear source be used as intended nor requires that the escape or release of nuclear material be unintended. [18]   What Price–Anderson does require is that the escape or release occur in connection with indemnified activity, and neither the production nor application of radiopharmaceuticals is an activity which would qualify for indemnification since licenses for such activities are not subject to section 2210(a)'s financial protection requirements.

*Kerr–McGee Corp. v. Farley,* 115 F.3d 1498 (10th Cir.1997), *cert. denied,* 522 U.S. 1090, 118 S.Ct. 880, 139 L.Ed.2d 868 (1998), also misconstrues the Act. *Farley* involved an attempt by Kerr–McGee to enjoin a Navajo **\*341**  Tribal Court from exercising jurisdiction over a complaint which alleged that certain tribal members residing on the reservation had been injured by radioactive and toxic materials released from a uranium milling facility operated by Kerr–McGee on land leased from the

tribe. 🔖 *Farley,* 115 F.3d at 1500. Kerr–McGee contended that the complaint alleged a public liability action and that 🔖 §
2210(n)(2) provided federal courts with exclusive jurisdiction over such claims. 🔖 115 F.3d at 1500–01. The primary issue
addressed by the Tenth Circuit was whether "the Price–Anderson Act so obviously preempts tribal jurisdiction that an action in
tribal court 'would be patently violative of express jurisdictional prohibitions,' and that abstention in favor of tribal exhaustion
is inappropriate." 🔖 115 F.3d at 1502. [19]

However, before reaching the abstention issue, *Farley* first addressed an argument raised by the defendants (the plaintiffs in the
tribal court action) that the Price–Anderson Act "simply does not apply ... because Kerr–McGee does not have an indemnity
agreement with the federal government." 🔖 *Farley,* 115 F.3d at 1504. The tribal defendants based their argument on 🔖 *Silkwood
v. Kerr–McGee Corp.,* 464 U.S. 238, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984), a pre-Amendments Act case, which at one point
states:

> Although the Price–Anderson Act does not apply to the present situation, [12] the discussion preceding its enactment and
> subsequent amendment [in 1966] indicates that Congress assumed that persons injured by nuclear accidents were free to
> utilize existing state tort law remedies.
>
> ****
>
> [12] Under the Act, the NRC is given discretion whether to require plants licensed under § 2073 to maintain financial
> protection. 🔖 42 U.S.C. § 2210(a). Government indemnification is available only to those required to maintain financial
> protection, 🔖 § 2210(c), and certain others not relevant here, § 2214(t), and the liability limitation applies only to those
> who are indemnified. 🔖 § 2210(e). The NRC did not require plutonium processing plants to maintain financial protection
> until 1977, 42 Fed.Reg. 46 (1977).
>
> [ 🔖 *Silkwood,* 464 U.S. at 251–52 & n. 12, 104 S.Ct. 615 (second footnote omitted) ].

*Farley* rejected the tribal defendants' argument, explaining that *Silkwood*

> simply refused to apply the indemnification provisions of [the Act] to the claim in that case because the
> defendant lacked the necessary indemnity agreement. Nothing in *Silkwood* suggests that the absence of an
> indemnity agreement makes [the Act's] jurisdictional provisions inapplicable. Furthermore, as quoted ...
> the jurisdictional provisions of [the Act], as amended by the 1988 Amendments, appear broad enough
>
> to create a federal forum for any tort claim even remotely involving atomic energy production. [ 🔖 115
> F.3d at 1504 (citations omitted) ].

However, in reaching the conclusion that Price–Anderson's jurisdictional provisions "appear" to sweep broadly, *Farley* relied
on a paraphrase, rather than a quote, of the definition of "nuclear incident." This paraphrase, moreover, omits the key clause
"including an extraordinary nuclear occurrence." 🔖 115 F.3d at 1504 (" 'nuclear incidents' ... are defined ... to include
any occurrence causing any personal or property damage arising out of the toxic, radioactive, explosive or other hazardous
properties of atomic or byproduct materials"). *Farley* never considered whether the statutory definition of extraordinary nuclear
occurrence, or any other defined phrase for that matter, shed light in any way on the proper construction of the definition of
nuclear incident. [20]

**\*342**  It also appears that *Farley* misread *Silkwood*. *Silkwood* addressed the question of whether certain provisions of the AEA which provided for the exclusive federal regulation of nuclear safety preempted "a state-authorized award of punitive damages arising out of the escape of plutonium from a federally licensed nuclear facility." *Silkwood,* 464 U.S. at 241, 104 S.Ct. 615. As the opinion explained, at the time of the "escape" which formed the basis of the suit occurred, the plutonium facility was not subject to an indemnification agreement, and, thus "the Price–Anderson Act does not apply." 464 U.S. at 251–52; *see* 464 U.S. at 279, 104 S.Ct. 615 (Powell, J., dissenting) ("[the Act] *did not apply at all* to the Kerr–McGee plant at the time of this incident") (emphasis added). However, although Price–Anderson did not control the analysis, the Court still found the legislative history of the Act to be illuminating. *Silkwood,* 464 U.S. at 251–55, 104 S.Ct. 615; *see In re TMI,* 67 F.3d at 1124. In particular, the Court focused on the discussion regarding the decision to leave the substantive determinations as to liability and damages on claims for public liability to state courts. *Silkwood,* 464 U.S. at 253–55, 104 S.Ct. 615. These discussions, the Court noted, demonstrated a belief on the part of Congress that state tort law remained undisturbed by the enactment of the AEA in 1954. 464 U.S. at 254–55, 104 S.Ct. 615 ("[i]f other provisions of the [AEA] already precluded the States from providing remedies to its citizens, there would have been no need [to assure Price–Anderson would not preclude them]"). Based in part on this history, *Silkwood* concluded that although the federal occupation of the field of nuclear safety under the AEA did not, in itself, preempt state tort law, preemption could still occur when "there is an irreconcilable conflict between the federal and state standards [of nuclear safety] or [when] the imposition of a state standard in a damages action would frustrate the objectives of the federal law." 464 U.S. at 256, 104 S.Ct. 615.

*Farley,* however, read *Silkwood* to suggest that in addition to the federal government having occupied the field of nuclear safety under the AEA, it had also occupied the field of "nuclear industry liability" under Price–Anderson. *Farley* thus read *Silkwood* to hold that while the AEA's occupation of the field did not preempt state law in 1957, the amendment of the AEA by Price–Anderson in 1957 *would have* preempted state law were it not for the fact that Price–Anderson did not create a conflicting federal cause of action:

> In 1957, Congress amended the AEA through the Price–Anderson Act (PAA), creating specific protections from tort liability for the nuclear industry. *See Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 251, 104 S.Ct. 615, 78 L.Ed.2d 443 (1984).... While the PAA specifically made nuclear industry liability a federal concern, Congress initially chose not to create a specific federal cause of action for nuclear torts; rather, the legislative history suggests that Congress was content to allow liability to be dictated by existing causes of action. *Silkwood,* 464 U.S. at 252–55, 104 S.Ct. at 623–25 (finding state punitive damages statute not preempted by the PAA). [ *Farley,* 115 F.3d at 1503].

*Farley* apparently failed to recognize, however, that the field of "nuclear industry liability" with which Price–Anderson was concerned did not extend to the entire field of "nuclear safety" that was the concern of the AEA. *Farley* equated the "the nuclear industry," *i.e.,* those in "private industry" given a role in the "production and use of atomic materials" by the AEA's licensing scheme, with those afforded "specific protections from tort liability" by Price–Anderson. 115 F.3d at 1503. In short, *Farley* viewed Price–Anderson's "protections" as shielding *all* persons licensed pursuant to the AEA.

*Farley,* therefore, proceeded to conclude that the creation of a federal cause of action by the Amendments Act was an indication that "Congress intended to expand federal control over safety and liability issues involving **\*343** the nuclear industry." 115 F.3d at 1504. [21] The new provisions, therefore, preempted all state-law "nuclear torts," by creating "a federal forum for any

tort claim even remotely involving atomic energy production." 📑 115 F.3d at 1503–04 ("[w]hile not otherwise superseding the decision in *Silkwood,* the 1988 Amendments can be read in part as a congressional response to the result in *Silkwood* suggesting that the PAA never preempts state punitive damages awards"). Since *Farley* concluded that Price–Anderson's "protections," i.e., its jurisdictional provisions, extended to all AEA licenses, it was immaterial that *Silkwood* stated that Price–Anderson's indemnification provisions only applied to certain licenses.

*Farley*'s confusion is understandable. One cannot, by merely reading *Silkwood* (or *TMI II,* another decision to which *Farley* refers), conclusively determine whether Price–Anderson's jurisdictional provisions operate independently from its indemnification provisions. Nor does a paraphrase of the definition of "nuclear incident" lead to the conclusion that the Act employs the word "occurrence" more narrowly than its ordinary meaning. However, as discussed extensively above, whether as a matter of statutory construction or the structure and history of the Act, no claim for public liability can lie in the absence of an applicable indemnity agreement.

There is also the recent unreported decision of *Gassie v. SMH Swiss Corp.,* 1998 WL 71647 (E.D.La. Feb.17, 1998) to consider. *Gassie* involved a claim that "tritium, a radioactive isotope used in Swatch Watches to provide luminescence, escaped [from the watches] and was absorbed into the bodies of [p]laintiffs." *Gassie,* 1998 WL 71647, at *1. The defendant, a NRC licensee, **removed** the action, asserting that the plaintiffs alleged a public liability action arising out of a nuclear incident. While *Gassie* conceded that "there is little support in the legislative history or in other legal precedent for the idea ... that the leaking of tritium from Swatch Watches constitutes a nuclear incident," it nonetheless concluded that, "the unambiguous words of the Price–Anderson Act indicate that Plaintiffs' claims do constitute a public liability action arising from a nuclear incident." 1998 WL 71647, at *5.

Again, in addition to not considering the context in which the language of the Price–Anderson is employed, *Gassie,* like *Farley,* failed to recognize that the Act is not universally applicable to all AEA licenses. For example, in describing the defendant's argument for the application of the Act, *Gassie* confuses Price–Anderson's provisions with the AEA's provisions for the regulation of nuclear materials:

> Although Defendants attempt to present two arguments for **removal**, namely the Price–Anderson Act and complete preemption based on pervasive federal regulations of tritium, the federal regulations Defendants rely upon are merely a supplement to the Price–Anderson Act. If the Price–Anderson Act does not provide federal jurisdiction, the federal regulations promulgated under that act will not provide federal jurisdiction either. [1998 WL 71647, at *2].

Further indication that *Gassie* construed the coverage of the Act to be coextensive with the NRC's authority to regulate nuclear materials under the AEA is found in the suggestion that the plaintiff's claims would not be preempted (despite coming within the "unambiguous words" of the Act) "if it can be established that the NRC permitted regulatory control of nuclear by-products to be assumed by the State of Louisiana." 1998 WL 71647, at *6. *Gassie* apparently was referring here to a provision of the AEA, 42 U.S.C. § 2021, which was added in 1959 "in order to 'clarify the respective responsibilities ... of the States and the Commission with respect to the regulation of byproduct, source and special nuclear materials.' " 📑 *Silkwood,* 464 U.S. at 250, 104 S.Ct. 615 (*quoting* 42 U.S.C. § 2021(a)(1)). Under this provision

[t]he Commission was authorized to turn some of its regulatory authority over to any State which would adopt a suitable regulatory program. However, the Commission ***344*** was to retain exclusive regulatory authority over "the disposal of such ... byproduct, source or special nuclear material as the Commission determines ... should, because of the hazards or potential hazards thereof, not be disposed of without a license from the Commission." 42 U.S.C. § 2021(c)(4). The States

were therefore still precluded from regulating the safety aspects of these hazardous materials. [ 464 U.S. at 250, 104 S.Ct. 615 (footnote omitted) ].

*Gassie,* assumed, however, that since the materials at issue were still subject to licencing under the AEA, they must, by default, be covered by Price–Anderson: "The alleged radioactive discharge from Swatch Watches in Plaintiffs' Complaint seems to constitute the very kind of radiation hazard to which the Price–Anderson Act must apply in the absence of a regulatory control agreement between a state and the NRC." 1998 WL 71647, at *7. *Gassie* also relied upon yet another section of the AEA, 42 U.S.C. § 2114, "[a]s further support for the appropriateness of applying the Price–Anderson Act in the absence of a regulatory agreement between a state and the NRC." 1998 WL 71647, at *7. Section § 2114(a)(1), *Gassie* explained, "provides that the NRC has the power to protect the public from both the radiological and non-radiological hazards of certain byproducts." 1998 WL 71647, at *7. This provision, however, is irrelevant to the application of Price–Anderson. Section 2114, which is part of the Uranium Mill Tailings Act of 1978, Pub.L. No. 95–604, 92 Stat. 3021 (1978), merely "authorizes the Commission to promulgate, implement and enforce regulations governing permanent Federal custody of uranium mill tailings disposal sites and governing the activities of the Department of Energy [in regard to such sites]." H.Rep. No. 95–1480, pt. I, at 45 (1978), *reprinted in,* 1978 U.S.C.C.A.N. 7433, 7472.

It may well be that one reason *Farley* and *Gassie* fail to recognize that the scope of Price–Anderson coverage is narrower than the coverage of the AEA itself is because, on the whole, the vast majority of reported Price–Anderson decisions involve indemnified conduct. The question never arises whether Price–Anderson applies to claims which are *not* subject to an agreement of indemnification. Indeed, a survey of post-Amendment Act reported opinions reveals that, of the 25 actions in which public liability is alleged, 21 involve indemnified activity. [22] Of the four which involved unindemnified conduct, only *Farley* and *In re Cincinnati,* discussed above, actually attempt to grapple with the **\*345** issue. Of the remaining two, 🚩 *El Paso Natural Gas Co. v. Neztsosie,* 136 F.3d 610 (9th Cir.1998), *petition for cert. filed,* 67 U.S.L.W. 3024 (U.S. June 26, 1998), recognizes (but declines to reach) the issue, [23] while the other, *Boughton v. Cotter Corp.,* 65 F.3d 823 (10th Cir.1995), does not. [24] In light of the infrequency with which the issue arises, it is not surprising that both courts and litigants continue to engender confusion when confronted with the argument that the Act applies to claims which do not fall within its coverage.

There is one additional post-Amendments Act opinion, *Leo v. Kerr–McGee Chem. Corp.,* 37 F.3d 96 (3d Cir.1994), that deserves consideration. *Leo* involved personal injury claims arising out of radioactive contamination at the former site of the Welsbach Gas Mantle Company's manufacturing facility located in Gloucester City, New Jersey. *Leo,* 37 F.3d at 97–98. The facility operated from the turn of the century until the early 1940's, generated thorium by-products which were "deposited on the factory site, thus contaminating the surrounding land." The plaintiffs, former neighbors of the site, brought suit for their injuries in state court under state-law theories of strict liability. The action was **removed** on diversity grounds. 37 F.3d at 98. If Stepan is correct, and if *Farley* and *Gassie* were correctly decided, the claims in *Leo* were pre-empted by Price–Anderson. However, no mention of Price–Anderson, public liability, or pre-emption is made in *Leo.* Normally, I would find such silence of limited persuasive value. However, the Third Circuit decided *Leo* subsequent to its *TMI II* decision, in which it explained (in forceful terms) that

[a]fter the Amendments Act, no state cause of action based upon public liability exists. A claim growing out of any nuclear incident is compensable under the terms of the Amendments Act or it is not compensable at all. Any conceivable state tort action which might remain available to a plaintiff following the determination that his claim could not qualify as a public liability action, would not be one based on "any legal liability" of "any person who may be liable on account of a nuclear incident." It would be some other species of tort altogether, and the fact that the state courts might recognize such a tort has no relevance to the Price–Anderson scheme. At the threshold of every action asserting liability growing out of a nuclear incident, then, there is a federal definitional matter to be resolved: Is this a public liability action? If the answer to that question is "yes," the provisions of the Price–Anderson Act apply; there can be no action for injuries caused by the release of radiation from

federally licensed nuclear power plants separate and apart from the federal public liability action created by the Amendments Act. [ ⚠ *TMI II,* 940 F.2d at 854–55].

It is highly unlikely that, if the claim in *Leo* was indeed one for public liability, the Third Circuit, with its wealth of experience interpreting and applying Price–Anderson (garnered from TMI-related appeals) would fail to recognize it as such. The more likely explanation, and the one I believe to be correct, is that the claims in *Leo,* like the claims here, fail to state a cause of action for public liability because these did not arise out of indemnified activity.

To summarize, preemption under Price–Anderson sweeps broadly to include any **\*346** claim alleging "public liability;" that is, "any legal liability arising out of or resulting from a nuclear incident." § 2014(w). For there to be nuclear incident, however, there must be an "occurrence," and an occurrence under the Act can only be an "event .... [at] 'the location' or 'the contract location' as defined in the applicable ... indemnity agreement, entered into pursuant to section 2210." § 2014(j) & (q). No such agreement covers the Maywood Chemical tailings. Therefore, no event alleged by plaintiff can constitute an "occurrence." Plaintiff's action, therefore, is not "one based on 'any legal liability' of 'any person who may be liable on account of a nuclear incident,' " ⚠ *TMI II,* 940 F.2d at 854, and cannot be **removed** pursuant to 42 U.S.C. § 2210(n)(2).

### *Federal Torts Claims Act.*

Stepan's Notice of **Removal** alleges that "at relevant times" Stepan acted as an agent or employee of the United States Government, and, therefore, "[s]ome or all of the claims or causes of action alleged in the Complaint ... arise under the Federal Tort Claims Act." Notice of **Removal** ¶ 18–19. **Removal** is proper, Stepan contends, under 28 U.S.C. § 1331, which grants federal courts original jurisdiction over "civil actions arising under the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 1441(a), which permits the **removal** of any state court action over which "the district courts of the United States have original jurisdiction." However, for the reasons set forth below. Stepan cannot proceed on this basis.

When Congress granted the federal courts original (and exclusive) jurisdiction over Federal Tort Claims Act ("FTCA") actions, it did so under 28 U.S.C. § 1346(b)(1), *not section* 1331. Under section 1346(b)(1), the only causes of action which "arise under" the FTCA are: "civil actions *on claims against the United States,* for money damages ... for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b)(1) (emphasis added). Congress further limited this grant by providing that no cause of action can lie, under the FTCA or otherwise, against a federal agency or employee [25] for a claim which would be otherwise cognizable under the FTCA if asserted against the United States. 28 U.S.C. § 2679(a) & (b)(1).

 **[14]**   **[15]**   Original jurisdiction, therefore, does not encompass would-be FTCA claims which are asserted against federal agencies or employees. *See Mignogna v. Sair Aviation, Inc.,* 937 F.2d 37, 41 (2d Cir.1991) (FTCA confers jurisdiction only when United States, rather then federal agency, is named); *Galvin v. Occupational Safety & Health Admin.,* 860 F.2d 181, 183 (5th Cir.1988) (federal courts have no FTCA jurisdiction over claims brought against federal agency or employee); *Kieffer v. Vilk,* 8 F.Supp.2d 387, 392–93 (D.N.J.1998) (same); *Denney v. United States Postal Serv.,* 916 F.Supp. 1081, 1083 (D.Kan.1996) (same); *Mokwue v. United States,* 884 F.Supp. 228, 231 (N.D.Tex.1995) (same); *Murphy v. Mayfield,* 860 F.Supp. 340, 343 (N.D.Tex.1994) (same); *McKenith v. United States,* 771 F.Supp. 670, 673 (D.N.J.1991) (same); *see also Allgeier v. United States,* 909 F.2d 869, 871 (6th Cir.1990) ("[f]ailure to name the United States as defendant in an FTCA suit results in a fatal lack of jurisdiction"). Nor would such a claim fall within 28 U.S.C. § 1331's grant of jurisdiction over

civil actions "arising under" the Constitution or laws of the United States because the federal  *347  agency or employee could raise an immunity defense under the FTCA's exclusive remedy provision. Under the "well-pleaded complaint" rule, a claimant's cause of action does not "arise under" the laws of the United States merely because it might implicate a federal immunity defense. *See Franchise Tax Bd. v. Construction Laborers Vacation Trust for Southern California,* 463 U.S. 1, 10–11, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983) (presence of federal defense—even one pled on face of complaint—not sufficient to bring a claim within "original" federal-question jurisdiction under section 1331). Stepan thus cannot rely on section 1441 to **remove** plaintiff's action. *Metropolitan Life Ins. Co. v. Taylor,* 481 U.S. 58, 63–64, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987) (well-pleaded complaint rule precludes **removal** under section 1441(a) based merely on presence of a federal defense).

[16]    Stepan, however, could have asserted **removal** was proper under the Federal Officer **Removal** Statute, 28 U.S.C. § 1442(a), which provides, in part, that, "[a] civil action ... commenced in a State court against any of the following may be **removed** by them ...: (1) The United States or any agency thereof or any officer (or any person acting under that officer) of the United States or of any agency thereof, sued in an official or individual capacity for any act under color of such office." 28 U.S.C. § 1442(a)(1). Operation of section 1442(a) is not limited by the well-pleaded complaint rule; "[r]ather, it the raising of a federal question in the ... **removal** petition that constitutes the federal law under which the action ... arises." *Mesa v. California,* 489 U.S. 121, 136–37, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). [26] The operation of section 1442(a) clearly was not foreign to Stepan; its Notice of **Removal** has a separate section captioned "Federal Officer **Removal**," in which Stepan argues that, in regard to the conduct alleged in plaintiff's now-absent spoliation of evidence claim, Stepan should be regarded as a "person acting under" a federal officer. Notice of **Removal** ¶¶ 22–25. Stepan's FTCA argument, however, was clearly placed under the separate caption of "Federal Question Jurisdiction." Notice of **Removal** ¶¶ 14–21.

[17]    [18]    Despite Stepan's failure to rely on federal officer **removal** in this instance, I can still consider its allegations under section 1442(a)(1). A court may permit a defendant to amend a Notice of **Removal** to correct defects in allegations of jurisdiction. 28 U.S.C. § 1653. "An imperfect or defective allegation is distinguished from a missing allegation, which may not be added by amendment after the 30–day period [for **removal** under 28 U.S.C. § 1446] has expired." *American Educators Fin. Corp. v. Bennett,* 928 F.Supp. 1113, 1115 (M.D.Ala.1996). Stepan's mischaracterization of its FTCA allegations resulted in an "imperfect or defective" allegation.

[19]    For **removal** to be proper under section 1442(a)(1), a defendant must sufficiently allege that (1) it is a federal agency or federal officer, (2) that there exists a "causal connection" between the alleged conduct and the asserted official authority, and (3) that it has a "colorable" federal defense to the claim. *Mesa,* 489 U.S. at 124–37, 109 S.Ct. 959; *Willingham v. Morgan,* 395 U.S. 402, 89 S.Ct. 1813, 23 L.Ed.2d 396 (1969). In one respect, the inquiry here collapses the first and second requirements into the third: Stepan can only claim to have a colorable federal defense under the FTCA if it can show that it is a federal agency or officer and that it was acting within the scope of its office or employment. With that point in mind, I turn to consider Stepan's allegations.

[20]    A defendant cannot establish that it was a federal agency or employee, by merely alleging in its Notice, as Stepan does, that it was an "agent or employee of the United States Government." *See Morse v. Lower *348 Merion School Dist.,* 132 F.3d 902, 906 (3d Cir.1997) (although courts generally accept allegations made in pleadings as true, courts need not credit "bald assertions" or "legal conclusions"); *In re Burlington Coat Factory Sec. Lit.,* 114 F.3d 1410, 1429–30 (3d Cir.1997) (same); *see also State v. Ivory,* 906 F.2d 999, 1001 n. 4 (4th Cir.1990) (allegation which parroted statutory language as if it were "some talismanic invocation" does not satisfy section 1442(a)); *Jamison v. Wiley,* 14 F.3d 222, 239 n. 17 (4th Cir.1994) (same). Instead, Stepan's Notice must point to facts alleged in the Joint Complaint, or aver facts its own, which

support a finding that it was a federal agency or employee. [27]   In this regard, the factual allegations Stepan makes in support of its FTCA claim are as follows:

> 20. The Complaint alleges that the United States Government has had extensive involvement in the circumstances which have given rise to the alleged contamination. Among other things, the Complaint alleges that the Department of Energy purchased the Maywood Interim Storage Site (the "MISS") from Stepan in 1985. The plaintiff[ ] allege[s] that the MISS is a source of radiological and chemical contamination at the Maywood site.

> 21. In addition, the Department of Energy is overseeing pursuant to the FUSRAP program, the clean-up of a number of residential properties identified in the Complaint which are allegedly contaminated properties. [Notice of **Removal** ¶¶ 20–21 (citation to Joint Complaint omitted) ].

These allegations do not even remotely establish that Stepan is a federal agency or employee (or, for that matter, a "person acting under" a federal officer). The allegation that Stepan sold the MISS property to DOE establishes only that an arms-length real estate transaction occurred between Stepan and DOE. The other allegations, that DOE is conducting a clean-up of contaminated properties and that the MISS property, which DOE owns, is a source of contamination, fail to establish *any* relationship between Stepan and the federal government. At best, plaintiff, in addition to his claims against Stepan for its conduct, might have a separate claim against the United States for the acts *of DOE and its employees*. But the fact that plaintiff might have a claim arising out of the acts of a federal agency and its employees does not transform Stepan into a federal agency or employee.

Stepan, perhaps recognizing the inadequacies of the allegations raised in its Notice, has raised an additional allegation in its brief. Stepan now contends that, during World War II, the United States Government, in the person of the Alien Property Custodian, [28]  seized Maywood Chemical and dedicated its manufacturing operations to the war effort. Resp.Br. at 6–8. The seizure occurred, Stepan argues, "under emergency war powers stemming from the prior ownership [of Maywood Chemical by] german nationals," namely, Dr. Louis Schaefer, the German chemist who founded the company after he emigrated to the United States in 1895. Resp.Br. at 5–6. For this reason, Stepan contends that Maywood Chemical was a corporation primarily acting as an instrumentality or agency of the United States, and that Stepan, as successor in interest, should be able to invoke **\*349** federal agency status under the FTCA. *See* § 2671 (" 'Federal agency' includes ... corporations primarily acting as instrumentalities or agencies of the United States").

Stepan submits a certification of counsel which attaches "public documents which establish that for many years, the United States Government directed the day-to-day operations of the Maywood Chemical Works." Resp.Br., at 26. Stepan's allegations of government seizure should have been included in its Notice of **Removal** to be properly considered. However, I can still consider the documents appended to the certification in weighing whether Stepan is a federal agency entitled to **remove** under section 1442(a)(1). *See Willingham,* 395 U.S. at 407 n. 3, 89 S.Ct. 1813 (although material should have appeared in petition for **removal**, it was proper to treat petition as amended to include relevant information contained in later-filed affidavits). I turn, therefore, to consider whether Stepan has sufficiently demonstrated that, during World War II, Maywood Chemical was a corporation primarily acting as an instrumentality or agency of the United States.

**[21]**   The inquiry into whether a corporation was primarily acting as an instrumentality or agency of the United States is intensely fact-specific. Courts addressing the issue consider the following factors: "(1) the federal government's ownership interest in the entity; (2) federal government control over the entity's activities; (3) the entity's structure; (4) government involvement in the entity's finances; and (5) the entity's function or mission." *Mendrala v. Crown Mortgage Co.,* 955 F.2d 1132, 1136 (7th Cir.1992). There are, however, "no sharp criteria for determining whether an entity is a federal agency within the meaning of the [FTCA], but the critical factor is the existence of federal government control over the 'detailed physical performance' and 'day to day operation' of that entity." *Lewis v. United States,* 680 F.2d 1239, 1240 (9th Cir.1982) (*quoting United States v. Orleans,* 425 U.S. 807, 814, 96 S.Ct. 1971, 48 L.Ed.2d 390 (1976) and *Logue v. United States,* 412 U.S.

521, 528, 93 S.Ct. 2215, 37 L.Ed.2d 121 (1973)); *see* 🔖 *Mendrala,* 955 F.2d at 1137 ("[w]hile the government control factor may not be dispositive ... it [is still] an important factor in determining whether an entity is a federal agency under section 2671").

During the war, the Alien Property Custodian possessed the broad power "to direct, manage, supervise, control or vest" interests in property owned by nationals of a designated enemy country. Executive Order No. 9193, § 2, 7 Fed.Reg. 5205 (1942) (amending 🔖 Executive Order No. 9095). The Custodian generally exercised his authority through either his power to vest or supervise. Paul V. Myron, *The Work of the Alien Property Custodian,* 11 Law & Contemp.Probs. 76, 79–80 (1945) ("Myron"). When an interest in property was vested by the Custodian, all rights held the former owners were vitiated and transferred to the Custodian. Myron at 79. In contrast, title to property under the Custodian's supervision remained in the hands of the original owner; the Custodian obtained only the right to control the property's use and operation. Myron at 80. In addition to the powers held by the Custodian, the Treasury Department possessed the ability to exercise "freezing control" over property interests of enemy nationals not under the control of the Custodian. Myron at 76–77. All transactions regarding interests in property owned by enemy nationals—the distribution of dividends accruing on stock holdings, for example—were also generally subject to license by Treasury. Myron at 77, 80.

When determining what type of control (if any) to exercise over a business enterprise, the primary concern of the Custodian was "the elimination of any actual or potential enemy control of the business." Myron at 80. Thus, when enemy nationals controlled the entire enterprise, the Custodian often would vest both the interest of the enemy nationals *and* the assets of the enterprise itself. In contrast, when only a portion of the enterprise was subject to foreign control, the Custodian would merely vest the property interest in enemy hands. Myron at 80. In the case of small minority stock interests incapable of influencing the control or operation of the enterprise, the Custodian was satisfied to stay his hand and leave the interest to be **\*350** regulated by Treasury under its licensing authority. Myron at 80.

The actions taken by the Custodian after an interest in a business enterprise was vested also varied. As one contemporary description of the process put it:

> When the Custodian assumes control of an enterprise, he takes immediate steps to assure the continuous operation or orderly liquidation of the business. If he finds that the enemy control has penetrated the management, he restaffs the enterprise with qualified personnel. When the existing management is reliable and there is no evidence of enemy sympathies or affiliations that might restrict operations, the Custodian usually exercises his control as a stockholder through the normal corporate processes such as participation in the election of an appropriate board of directors. [Myron at 81].

Most often, the Custodian adopted a "hands-off" supervisory role towards the enterprise. Stacey R. Kole & J. Harold Mulherin, *The Government as a Shareholder: A Case from the United States,* 40 J.L. & Econ. 1, 8 (1997) ( "Kole & Mulherin"). Instead of actively directing the business, the Custodian would permit the existing management to continue operating the business in the normal course under a general authorization. Special authorization from the Custodian was required only when major undertakings, such as the purchase or sale of substantial capital assets, were contemplated. Kole & Mulherin at 8–9.

Stepan contends that the government seized "complete control" of Maywood Chemical and that the Treasury Department initially operated the company until "it later transferred its responsibilities to the Office of [the] Alien Property Custodian." Resp. Br., at 6. It relies on a January 4, 1943 letter from the "Secretary of the Executive Committee" of the Office of the Alien Property Custodian addressed to "Maywood Chemical Works" and referencing "Maywood Chemical Works, as Described in Vesting Order No. 206 and Supervisory Order No. 12." Aronson Cert., Ex. E. The letter reads, in relevant part:

This is to inform you that the Alien Property Custodian, having determined to exercise certain power and authority conferred upon him by Section 2 of [🚩] Executive Order No. 9095, as amended, with respect to the subject company, more particularly described in the above numbered order of the Alien Property Custodian, has vested the same or has undertaken supervision thereof, or both, as specified therein. Accordingly this Office has requested the release of this company from Treasury controls, and has asked the Treasury Department to inform the appropriate Federal Reserve Bank to revoke all outstanding licenses.

There are enclosed herewith copies of the said Vesting Order and/or Supervisory Order, and the Authorization of the Alien Property Custodian. This Authorization prohibits all acts unless they have the approval of the Alien Property Custodian, his delegate or supervisor. Within a few days you will receive a supplemental Authorization permitting you to engage in certain specific transactions. This Authorization will be signed by ... James Crowley or Edward C. Tafft, or his appointee, under authority conferred by a Certificate of Appointment executed by the Alien Property Custodian on October 30, 1942, and published in the Federal Register (7 F.R. 8910). [Aronson Cert., Ex. E].

Neither Vesting Order No. 206, Supervisory Order No. 12, nor any Authorization is attached to the certification of Stepan's counsel. Vesting orders, however, were published in the Federal Register, and No. 206 can be found there. It reveals that on October 3, 1942, the Alien Property Custodian vested the following:

> 35,785–29/40th shares of $10 par value capital stock of Maywood Chemical Works, a New Jersey corporation, Maywood, New Jersey, which is a business enterprise within the United States, which shares are owned by the persons whose names, last known addresses, the number and types of share owned by them, and the percentages thereby represented of the specified types of outstanding shares, are, respectively, as specially set forth in Exhibit A attached hereto and made a part hereof. [7 Fed.Reg. 8072 (1942)].

**\*351** Exhibit A reveals the following break-down in the shares vested: 4,040 and ½ shares were Class A nonvoting 8% cumulative preferred, representing 32.8% of the class; 28,281 and 1/10 shares were Class D nonvoting preferred, representing 29.28% of the class; and 3,464 and 1/8 shares were voting common, representing 23.09% of the class. The owners from whom the shares had been seized were: Amalia Janner, of Bavaria, Germany; Central Hanover Bank & Trust Co., of New York, N.Y., as trustee for Ernst Kyriss of Stuttgart, Germany; and Dr. Carl G. Grossman of Brooklyn, N.Y., as trustee for Kurt Kyriss of Bavaria, Germany. 7 Fed.Reg. at 8073.

Vesting Order No. 206 establishes that the Custodian obtained only a minority ownership interest, represented by 23% of the voting common stock, in Maywood Chemical. This minority interest in itself cannot establish that Maywood Chemical was an agency of the United States. Indeed, standing alone, such a stake is more properly characterized as incidental or custodial. *Cf.* [📄] *Government Nat. Mortg. Assoc. v. Terry,* 608 F.2d 614, 617–18 (5th Cir.1979) (as utilized in definition of "agency" under [📄] 28 U.S.C. § 451 phrase "any corporation in which the United States has a proprietary interest" does not encompass corporations in which the interest of the Government is "custodial or incidental"); [📄] *Acron Investments, Inc. v. Federal Sav. and Loan Ins. Corp.,* 363 F.2d 236, 240 (9th Cir.) (same), *cert. denied,* 385 U.S. 970, 87 S.Ct. 506, 17 L.Ed.2d 434 (1966).

Moreover, a 23% minority ownership interest does not establish that the Custodian controlled the day-to-day operations of Maywood Chemical. In the first instance, how much control a 23% ownership share could exercise is speculative. Presumably a 23% stake had *some* ability to effect the control or operation of the business, else it would have been an unlikely candidate for vesting. Most likely, the control element was to be found in this minority share's ability to effect the election of directors. But whether a minority stake could merely block the election of a director, or actually elect one or more candidates, is unknown.

Second, whatever the extent of control by a 23% stakeholder, there is no indication in the record whether the Custodian *ever exercised* such control. As the discussion above illustrated, the extent to which the Custodian exerted influence over the business entities in which he vested interests varied from case to case. It turned, for the most part, on the degree to which enemy interests dominated the entity. Here there is no indication whether the degree of enemy influence extended beyond the mere ownership of the seized shares, that is, whether the Custodian took steps beyond merely securing control over the interest vested.[29] Nor can much weight be placed on the January 4 letter. Examination reveals it to be, at best, a form letter of transmittal. The language is broad and nonspecific. Its central reference point is "the subject company, more particularly described in the above numbered order." It informs that the Custodian "has vested the same or has undertaken supervision thereof, or both, as specified therein." The letter encloses an Authorization that "prohibits all acts" and informs that a supplemental Authorization sanctioning "certain specific transactions" will follow. It directs that all inquiries "should be referred to the nearest Alien Property Custodian Office" and lists addresses for New York, Chicago and San Francisco locations.[30] The letter carries no substantive force without reference to the orders and authorization it purports to accompany. The only "above numbered order" in the record, **\*352** however, indicates that only an interest in Maywood Chemical, as opposed to that entity as a whole, was vested. I decline to assume on the basis of the generalized language of the January 4 letter that the undisclosed Supervisory Order and Authorization reached beyond that interest.

Third, even the most generous assumption the record could support, that the Custodian exercised control over Maywood Chemical's board of directors proportional to the extent of the stake vested, does not constitute a degree of control sufficient to render Maywood Chemical an instrumentality of the government. The number of seats controlled by the Custodian would still be outnumbered by more than three-to-one. *See* *Mendrala,* 955 F.2d at 1138 (government control of five out of 18 board seats—27%—did not establish government control of corporation). Control of a minority of the board of directors coupled with the ability to issue general Authorizations would not change the outcome. This is particularly so in light of the fact that there is no indication in the record that any Authorization issued by the Custodian with regard to Maywood Chemical was other than regulatory in nature. *See* *Lewis,* 680 F.2d at 1240 (critical factor is existence of federal government control over the 'detailed physical performance' and 'day to day operation' of entity); *Mendrala,* 955 F.2d at 1138 (even "extensive federal regulation does not convert an entity into a 'federal agency' under the FTCA").

Stepan also attempts to intimate that the assignment of the Maywood Chemical site for cleanup under the federal Formerly Utilized Site Remedial Action Program ("FUSRAP") is somehow indicative of federal control of Maywood Chemical during the war. *See* Resp.Br. at 7–8, 10–12.[31] Stepan's description of FUSRAP as a program "to identify, investigate, clean-up or control sites where contamination above federal guidelines was attributable to the nation's atomic energy program," conveniently omits an entire class of non-energy (and non-government-related) sites which have been included in the program. The proper description of FUSRAP, culled from a source Stepan purports to rely on, states that "[t]he primary objective of FUSRAP is to identify and decontaminate sites where radioactive contamination remains from the early years of the nation's atomic energy program *or from commercial operations causing conditions that Congress has mandated DOE to remediate.*" DOE, *Response Actions at a FUSRAP Site in Maywood, NJ: Intent to Prepare a RI/FS–Environmental Impact Statement,* 55 Fed.Reg. 47907, 47908 (1990) (emphasis added); *see* Energy and Water Development Appropriations Act, 1984, Pub.L. No. 98–50, 97 Stat. 247 (1983) (directing DOE to undertake decontamination research and development project at the Maywood site under the auspices of FUSRAP). Indeed, several other public documents confirm that the Maywood site was assigned to FUSRAP, not because it was a former government site, but because (1) the radiological contaminants found at the Maywood site were similar to those at FUSRAP sites, (2) DOE had acquired extensive experience cleaning up such contaminants through its oversight of FUSRAP, and (3) FUSRAP was operational at the time. DOE, *Interagency Agreements between U.S. EPA and U.S. DOE relating to CERCLA Response Actions at the Wayne and Maywood Interim Storage Sites,* § 4 (Posted May 1, 1995) < http:// www.em.doe.gov/ffaa/mayinter.html>; *see In re the U.S. Department of Energy's Maywood Interim Storage Site: Federal Facility Agreement Under CERCLA Sec. 120,* Adm. Docket No. II CERCLA–FFA–00101, at sec. VI(13) (Sep. 17, 1990), *reprinted at* < http:// www.em.doe.gov/ffaa/maycercl.html> (although **\*353** Congress assigned site to FUSRAP, "[n]either DOE nor its predecessor agencies had a role in the generation of this contamination"); U.S. Army Corps of Engineers, *FUSRAP*

*Fact Sheet,* at ¶ 3 (Re–Posted May 29, 1998) < http:// www.fusrap.usace.army.mil/fusrap/geninf/whatis.html> ("Some sites with industrial contamination similar to that produced by [DOE predecessor] activities have also been added to FUSRAP by Congress").

The remaining three factors weigh against a finding that Maywood Chemical was an instrumentality of the government. There is no indication in the record that Maywood Chemical's structure was anything but the standard corporate form. Nor is there any indication that the United States Government ever funded any of Maywood Chemical's activities. Likewise, there is little in the record from which a characterization of Maywood Chemical's wartime "mission" can be drawn. Even Stepan's bald characterization of Maywood Chemical as "dedicated to the war effort," says little. I suspect that a significant portion of private industry was "dedicated to the war effort" during the years 1942 through 1945 without, at the same time, being converted into instrumentalities of the United States for the purposes of the FTCA.

 **[22]**   I cannot conclude that Maywood Chemical was a federal agency. Stepan had the burden of demonstrating that the federal government exercised actual control over Maywood Chemical's day-to-day activities, not merely that the government owned a minority block of stock or generally regulated Maywood's conduct. *See* *Lewis,* 680 F.2d at 1240; *Mendrala,* 955 F.2d at 1138. The record demonstrates only that the Alien Property Custodian vested a 23% minority share in Maywood Chemical during the war. The fact that an interest in Maywood Chemical was subject to wartime custodial vesting, however, does not convert Maywood Chemical into an instrumentality or agency. Absent other indicia of control, I cannot conclude that Maywood Chemical was a federal agency as that phrase is used in the FTCA. Stepan, therefore, could not **remove** this action on the basis that it was a federal agency entitled to invoke a federal defense under the FTCA.

### *Person Acting Under a Federal Officer.*

Stepan has also invoked federal officer **removal** on the more narrow ground that it was a "person acting under" a federal officer in respect to the conduct alleged in plaintiff's now-absent claim for intentional spoliation of evidence. The Thirty–Ninth Count of the Joint Complaint had alleged that "[u]pon notice of the filing" of plaintiff's suit, Stepan began to wilfully spoliate material evidence by **removing** (from where it is not said) contaminated soil. Joint Complaint at 162–63. Stepan's Notice of **Removal** responded by alleging that:

24. To the extent Stepan has had any involvement in the **removal** of contaminated soil at the Maywood site, such **removal** has been carried out at the exclusive direction of federal officers, including the Secretary of Energy, an officer of the Department of Energy, and the Contracting Officer, an officer of the Department of Energy with authority over the **removal** of wastes from the MISS property.

25. **Removal** of thorium-contaminated soil can only be effectuated pursuant to authorization from the Department of Energy. Accordingly, the legitimacy of all actions and the determination of all standards of care with respect to the handling of thorium and its byproducts will require this Court to construe and apply federal statutes and regulations. [Notice of **Removal**, at ¶¶ 24–25 (citations omitted) ].

The Notice further implied that section 1442(a) permitted it to **remove** the entire action, based on the existence of federal officer **removal** jurisdiction over the Thirty–Ninth Count. *See* Notice of **Removal**, at ¶¶ 22–25 (stating that **removal** of "the Action[ ]" is appropriate based on the allegations of the Thirty–Ninth Count).

 **[23]**    **[24]**   Given the dismissal of the Thirty–Ninth Count, the only question which remains is whether, assuming that **removal** of the Thirty–Ninth Count was proper under section 1442(a), jurisdiction was acquired over the remaining state law claims that had been joined with the Thirty–Ninth Count. It **\*354** is clear that section 1442(a) authorizes the **removal** of "a civil action" when a person acting under a federal officer is "sued in an official or individual capacity for any act under color of such office," § 1442(a)(1), and that this jurisdictional grant is limited only by the restrictions placed on federal court jurisdiction by Article III of the Constitution. *See* *Mesa,* 489 U.S. at 136–37, 109 S.Ct. 959. It is equally clear that federal courts have "long

adhered to principles of pendent and ancillary jurisdiction by which ... original jurisdiction over federal questions carries with it jurisdiction over state law claims that derive from a common nucleus of operative fact, such that the relationship between [the federal] claim and the state claim permits the conclusion that the entire action before the court comprises but one constitutional 'case.' " *City of Chicago v. International College of Surgeons,* 522 U.S. 156, ——, 118 S.Ct. 523, 529–30, 139 L.Ed.2d 525 (1997) (internal quotations omitted) (*quoting United Mine Workers of America v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966)). When a claim **removable** under section 1442(a)(1) is joined with additional, otherwise non-**removable** state law claims, the federal party **removing** the 1442(a)(1) claim can **remove** the entire action if the state law claims fall within the pendent jurisdiction of the federal courts. *Gibbs,* 383 U.S. at 725, 86 S.Ct. 1130; *see District of Columbia v. Merit Sys. Protection Bd.,* 762 F.2d 129, 132–33 (D.C.Cir.1985) (when claim **removed** under 1442(a)(1), court acquires jurisdiction over joined, pendent claims).

[25]   The existence of pendent jurisdiction over state law claims, however, cannot be established by merely demonstrating the presence of a viable, joined federal claim. *Gibbs,* 383 U.S. at 725 n. 12, 86 S.Ct. 1130 ("the issue whether a claim for relief qualifies as a case 'arising under .... the Laws of the United States' and the issue whether federal and state claims constitute one 'case' for pendent jurisdiction purposes" are distinct). Three requirements must be met: (1) "[t]he federal claim must have substance sufficient to confer subject matter jurisdiction on the court," (2) "[t]he state and federal claims must derive from a common nucleus of operative facts, and [ (3) ] the claims must be such that they would ordinarily be expected to be tried in one judicial proceeding." *MCI Telecommunications Corp. v. Teleconcepts, Inc.,* 71 F.3d 1086, 1102 (3d Cir.1995) (internal quotations omitted) (*quoting Gibbs,* 383 U.S. at 725, 86 S.Ct. 1130), *cert. denied,* 519 U.S. 815, 117 S.Ct. 64, 136 L.Ed.2d 25 (1996).[32] Of course, as the party seeking to invoke the district court's jurisdiction, it is Stepan's burden to establish that these requirements have been met. Stepan has failed to assert, however, either in its Notice or in its brief, that pendent jurisdiction reaches plaintiff's joined state law claims.

[26]   [27]   [28]   Stepan's failure may be due in large part to the fact that the second requirement is plainly not met here: the intentional spoliation of evidence claim pled in the Thirty–Ninth Count and the remaining state-law claims do not "derive from a common nucleus of operative fact." The acts of spoliation which Stepan contends were undertaken pursuant to federal direction are distinct (both in kind and temporally) from the acts which underlie plaintiff's state-law claims of tortious release and exposure. Indeed, the only connection between the claims is the single fact that the alleged acts of spoliation were directed towards an object which, coincidently, may be evidence that Stepan's otherwise unrelated conduct—conduct which may have occurred fifty or more years prior—caused plaintiff harm. This connection is too thin a reed to support a finding that the claims grow out of a "common nucleus of operative **\*355** facts." *See Lyon v. Whisman,* 45 F.3d 758, 762–63 (3d Cir.1995) (that federal claim for overtime pay and state contract and state claims for bonus arise out of the same employer/employee dispute insufficient to form nexus). Even if I presume jurisdiction existed over the now-absent Count Thirty–Nine, pendent jurisdiction cannot be exercised over plaintiff's remaining state law claims.[33]

### The Citizenship and Joinder of Vernieri and O'Brien.

[29]   It appears that the Court has jurisdiction over this action based solely on diversity. I must, therefore, return to the question of how to proceed regarding the joinder of Vernieri and O'Brien. The propriety of Vernieri and O'Brien's joinder cannot be determined without a finding as to their citizenship. I am, however, unable to conclude on this record that Vernieri and O'Brien are of non-diverse citizenship (or for that matter, whether they were fraudulently joined). At the same time, I cannot permit this action to proceed without making an inquiry into their citizenship: "The presence of a nondiverse party automatically destroys [diversity] jurisdiction: ... No party can waive the defect or consent to jurisdiction.... No court can ignore the defect." *Schacht,* 524 U.S. at ——, 118 S.Ct. at 2052 (citations omitted).

I therefore direct plaintiff, pursuant to 28 U.S.C. § 1653, to file a Second Amended Complaint within 10 days of the date herein which pleads the facts necessary to determine jurisdiction. Should the corrected pleading allege non-diverse citizenship, I shall consider whether joinder should be permitted or denied under 28 U.S.C. § 1447(e) and whether Vernieri and O'Brien have been fraudulently joined.

## CONCLUSION

For the forgoing reasons, plaintiff's motion to remand under 42 U.S.C. § 1447(c) for lack of subject matter jurisdiction is **DENIED.** Plaintiff is directed, pursuant to 28 U.S.C. § 1653, to file a Second Amended Complaint within 10 days of the date herein which correctly pleads the facts necessary for a federal court to determine its jurisdiction.

## All Citations

24 F.Supp.2d 325

## Footnotes

1  Stepan's Notice of **Removal**, which attached the Joint Complaint, also purported to **remove** the other 256 actions filed concurrently with plaintiff's. On February 13, 1998, I ordered that the 256 actions be remanded (to the extent they had been **removed** in the first instance) for failure to comply with proper **removal** procedure. My reasoning was straightforward: The procedures for **removal** set forth in 28 U.S.C. § 1446 did not permit the **removal** of 257 separate and independent actions by way of one notice of **removal** accompanied by a single $150 filing fee. Judge Hayden affirmed my order on June 5, 1998. The Third Circuit denied Stepan's petition for a writ of mandamus on July 27, 1998.

2  Plaintiff also argued that **removal** was procedurally improper since Stepan failed to obtain the consent of the "other defendants" before **removing**. A **removing** party, however, is not required to obtain the consent of fraudulently joined, **fictitious**, or unserved parties. *Balazik v. County of Dauphin,* 44 F.3d 209, 213 & n. 4 (3d Cir.1995). Although T.J. Gustenhoven Real Estate, Higgins Realtors, Gentry Realty Associates, and Michael Tracey were listed in plaintiff's caption and included in the "Defendants" section of the Joint Complaint, none of these defendants were named in the counts of the Joint Complaint adopted by plaintiff. Nor had they been served. Since plaintiff failed to allege any wrongdoing on behalf of these defendants, their joinder in plaintiff's action, if it occurred, would be fraudulent.

3  In re Cincinnati involved allegations that, between 1960 and 1972, two Cincinnati hospitals conducted human radiation experiments on behalf of the Department of Defense on terminal cancer patients without the patients' informed consent. *In re Cincinnati,* 874 F.Supp. at 803–04. The complaint had alleged in one count that the experiments constituted "nuclear incidents" causing injury, actionable under *Price–Anderson.* 874 F.Supp. at 830–31. It was held, however, that the allegations failed to state "the existence of a nuclear incident or occurrence that fits within the legislative history of the *Price–Anderson scheme."* 874 F.Supp. at 832. The experiments, the court explained, involved the application of nuclear medicine, namely the operation of a Cobalt–60 Teletherapy Unit, which "was employed as intended and cannot give rise to a claim under the *Price–Anderson Act."* 874 F.Supp. at 832. "Moreover," the court concluded, "liability under the Price–Anderson Act turns on the existence of a 'nuclear incident,' which does not occur when there is no unintended escape or release of nuclear energy." 874 F.Supp. at 832.

4    The Act also added a definition to the AEA, which read "[t]he term 'financial protection' means the ability to respond in damages for public liability and to meet the costs of investigating and defending claims and settling suits for such damages." Price–Anderson, sec. 3, § 11(j) (codified at 42 U.S.C. § 2014(k)), *reprinted in* 1957 U.S.C.C.A.N. at 629.

5    The licensee, in turn, was required to enter into the agreement as a further condition of its license. Price–Anderson, sec. 4, § 170(a), *reprinted in* 1957 U.S.C.C.A.N. at 630.

6    "Special nuclear material" is currently defined, in part, as "(1) plutonium, uranium enriched in the isotope 233 or in the isotope 235 ...; or (2) any material artificially enriched by any of the foregoing, but does not include source material." 42 U.S.C. § 2014(aa).

7    Price–Anderson also gave the AEC the discretion to indemnify, and require financial protection to be held by, those of its contractors it determined to be engaged in activities that involved the risk of a substantial nuclear accident. Price–Anderson Act, sec. 4, § 170(d) (codified as amended at § 2210(d)), *reprinted in* 1957 U.S.C.C.A.N. at 631.

8    An interpretation of the Price–Anderson Act promulgated by the AEC's General Counsel in the Code of Federal Regulations, later expressly relied on this definition of "occurrence," noting in particular that, "[t]his definition of 'occurrence' ... referred to in the Report ... is crucial to the Act's placing of venue under section 170(e) [now section 170(n)(2)]." 10 C.F.R. § 8.2(c) (1998).

9    The report continued by noting that "the circumstances surrounding any nuclear incident, including the willfulness, would certainly be grounds for examining and possibly suspending the operations under the license." S.Rep. No. 85–296, *reprinted in* 1957 U.S.C.C.A.N. at 1819.

10   Appropriate orders also included those "staying the payment of claims and the execution of court judgments, ... apportioning the payments to be made to claimants, ... permitting partial payments to be made before final determination of the total claims, and ... setting aside a part of the funds available for possible latent injuries not discovered until a later time." Price–Anderson Act, sec. 4, § 170(e), *reprinted in* 1957 U.S.C.C.A.N. at 631.

11   In 1974, Congress abolished the AEC and reassigned its responsibilities for licensing and regulating under the AEA to the NRC, and its oversight of government nuclear research facilities to the Department of Energy ("DOE"). *See* The Energy Reorganization Act of 1974, 42 U.S.C. § 5801 *et seq.* DOE also assumed the power under Price–Anderson to indemnify government contractors operating its facilities. This authority, however, is no longer discretionary: DOE is now required to indemnify any contractor it determines to be engaged in the type of risky activity Price–Anderson is intended to cover. *See* 42 U.S.C. § 2210(d).

12   A district court could still hear a TMI claim under 28 U.S.C. § 1332 if complete diversity of citizenship existed between the parties. *Kiick,* 784 F.2d at 496 n. 6.

13   Congress chose to create a federal cause of action arising under the Act, versus merely creating a federal forum for state-law based claims, "in order to satisfy the Article III requirement that federal courts have jurisdiction over cases arising under the Constitution or under the laws of the United States." S.Rep. No. 100–218, at 13, *reprinted in* 1988 U.S.C.C.A.N. at 1488; H.R.Rep. No. 100–104, pt. 1, at 18 (1987)H.R.Rep. No. 100–104, pt. 1, at 18 (1987).

14   A separate change worked by the Amendments Act did, however, expand public liability claims, although not in any respect relevant here. Prior to the Amendments Act, the NRC had taken the position that costs incurred for a precautionary evacuation ordered when a radiation release was imminent but subsequently did not occur would not be compensable from Price–Anderson funds since there would have been no "nuclear incident." H.R.Rep. 100–104, pt. 1H.R.Rep. 100–104, pt. 1, at 16. To ensure that such costs would be compensable out of Price–Anderson funds, Congress, through the Amendments Act, created a definition for "precautionary evacuation" and amended the definition of "public liability" to encompass the concept. Amendments Act, sec. 5(a) & (b). § 11(w) & (gg), 102 Stat. at 1070 (codified at 42 U.S.C. § 2014(w) & (gg)). As the House Report to the Amendments Act explained, "[the Amendments Act] makes it clear that the Act does cover the costs of precautionary evacuations by redefining the 'public liability' compensable under the Act to include liability arising out of precautionary evacuations as well as nuclear incidents." H.R.Rep. 100–104, pt. 1H.R.Rep. 100–104, pt. 1, at 16. The Third Circuit may thus have misspoke when it stated in a footnote in *TMI II* that "[p]ublic liability, a concept unchanged by the Amendments Act, was defined in the Price

Anderson Act as 'any legal liability arising out of or resulting from a nuclear incident or precautionary evacuation....'
" *TMI II,* 940 F.2d at 854 n. 19 (*quoting* 42 U.S.C. § 2014(w)).

15    The Amendments Act *did not* provide for federal jurisdiction over public liability claims arising out of precautionary evacuations. *See* 42 U.S.C. § 2210(n)(2). Congress was apparently content to leave the determination of these claims to the state courts.

16    The only materials licenses ever subjected to Price–Anderson's provisions at AEC or NRC's discretion are those for possession and use of plutonium in plutonium processing and fuel fabrication facilities. *See* 42 Fed.Reg. 46 (1977); 10 C.F.R. §§ 140.1(a), 140.2(a) (1998); H.R.Rep. No. 100–104, pt. 1.H.R.Rep. No. 100–104, pt. 1, at 11–12.

17    Nor, for that matter, is there any indication in the record that the clean-up program conducted at the facility from 1984 through 1997 by the DOE, in coordination with the United States Environmental Protection Agency, utilized contractors who were parties to an indemnification agreement under section 2210(e) which covered such clean-up activities.

18    Indeed, as noted in the main text above at 15–16, a nuclear incident occurs regardless of intent or fault.

19    The tribal exhaustion rule of *National Farmers Union Ins. Co. v. Crow Tribe,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), holds that a federal court should, as a matter of comity, "stay its hand" until the tribal court has had the opportunity to determine its own jurisdiction and the parties have exhausted all levels of tribal court review. *National Farmers,* 471 U.S. at 856–57, 105 S.Ct. 2447.

20    The definition of "public liability" also fell victim to extensive editing. 115 F.3d at 1504 (" '[p]ublic liability' is sweeping: it encompasses any legal liability from 'nuclear incidents' "). Moreover, an editorial comment to the definition of "public liability action" suggests that the provision of a federal cause of action is the primary purpose of Price–Anderson: "a public liability action 'shall be deemed to be an action arising under section 2210 of this title [which creates a federal forum for suit].' " 115 F.3d at 1504 (comment in original). The proper caption Congress assigned to section 2210 of title 42, however, is "Indemnification and limitation of liability." 42 U.S.C. § 2210.

21    Compare *Farley*'s characterization of the congressional intent behind the Amendments Act with the Third Circuit's in *TMI II,* quoted in the main text above at 22.

22    Of the 21 actions, 12 involved nuclear power plant licensees indemnified by NRC and nine involved DOE nuclear facilities operated by indemnified contractors. The most recent reported opinions for the licensee actions are: *In re TMI,* 89 F.3d 1106 (3d Cir.1996) (Three–Mile Island–2 Nuclear Power Plant), *cert. denied sub nom. Aldrich v. General Pub. Util. Corp.,* 519 U.S. 1077, 117 S.Ct. 739, 136 L.Ed.2d 678 (1997); *O'Conner v. Commonwealth Edison,* 13 F.3d 1090 (7th Cir.) (Quad Cities Cordova Nuclear Power Plant), *cert. denied,* 512 U.S. 1222, 114 S.Ct. 2711, 129 L.Ed.2d 838 (1994); *Caputo v. Boston Edison Co.,* 924 F.2d 11 (1st Cir.1991) (Pilgrim Nuclear Power Station); *McCafferty v. Centerior Serv. Co.,* 983 F.Supp. 715 (N.D.Ohio 1997) (Davis–Besse Nuclear Power Station); *McLandrich v. Southern Cal. Edison Co.,* 942 F.Supp. 457 (S.D.Cal.1996) (San Onofre Nuclear Generating Station); *Smith v. General Elec. Co.,* 938 F.Supp. 70 (D.Mass.1996) (Pilgrim Station Nuclear Power Plant); *Corcoran v. New York Power Auth.,* 935 F.Supp. 376 (S.D.N.Y.1996) (Indian Point–3 Nuclear Power Plant); *Bohrmann v. Maine Yankee Atomic Power Co.,* 926 F.Supp. 211 (D.Me.1996) (Maine Yankee Nuclear Plant); *Sawyer v. Commonwealth Edison Co.,* 847 F.Supp. 96 (N.D.Ill.1994) (Quad Cities); *Landry v. Florida Power & Light Corp.,* 799 F.Supp. 94 (S.D.Fla.1992) (Turkey Point Nuclear Reactor); *Coley v. Commonwealth Edison Co.,* 768 F.Supp. 625 (N.D.Ill.1991) (Dresdan Nuclear Power Plant), *Bubash v. Philadelphia Elec. Co.,* 717 F.Supp. 297 (M.D.Pa.1989) (Peach Bottom Nuclear Power Plant).

The most recent reported opinions for the contractor actions are: *Nieman v. NLO, Inc.,* 108 F.3d 1546 (6th Cir.1997) (Fernald Feed Materials Production Center); *Lujan v. Regents of Univ. of Cal.,* 69 F.3d 1511 (10th Cir.1995) (Los Alamos

National Laboratory); *Durfey v. E.I. DuPont De Nemours & Co.,* 59 F.3d 121 (9th Cir.1995) (Hanford Nuclear Reservation); *Building and Const. Dept. v. Rockwell Intern. Corp.,* 7 F.3d 1487 (10th Cir.1993) (Rocky Flats Nuclear Weapons Plant); *Day v. NLO, Inc.,* 3 F.3d 153 (6th Cir.1993) (Fernald); *Cook v. Rockwell Intern. Corp.,* 181 F.R.D. 473 (D.Colo.1998) (Rocky Flats); *Radiation Sterilizers, Inc. v. United States,* 867 F.Supp. 1465 (E.D.Wash.1994) (Hanford); *Lamb v. Martin Marietta Energy Sys., Inc.,* 835 F.Supp. 959 (W.D.Ky.1993) (Paducah Gaseous Diffusion Plant); *Crawford v. National Lead Co.,* 784 F.Supp. 439 (S.D.Ohio 1989) (Fernald).

23    The facts and issues involved in *Neztsosie* are essentially indistinguishable from those in *Farley.* However, in *Neztsosie,* the Ninth Circuit, having ruled for the tribal defendants on the tribal abstention question, expressly declined to reach the issue of the Act's application to non-indemnified conduct. *Neztsosie,* 136 F.3d at 620 n. 7 ("[i]n holding that Price–Anderson does not constitute an express jurisdictional prohibition, we need not consider the ... alternative claim that Price–Anderson does not apply because the mining companies had no indemnity agreement with the federal government").

24    *Boughton,* after mentioning that "plaintiffs brought an action alleging violations of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA) ... and the Price Anderson Act ..., as well as state law claims including negligence, trespass and nuisance," discusses CERCLA issues without further citation to Price–Anderson. 65 F.3d at 825 (citations omitted). Indeed, an earlier published opinion, *Boughton v. Cotter Corp.,* 10 F.3d 746 (10th Cir.1993), fails to mention Price–Anderson at all. In any event, *Farley* now presumably states the controlling law in the Tenth Circuit.

25    The FTCA defines "federal agency" as "the executive departments, the judicial and legislative branches, the military departments, independent establishments of the United States, and corporations primarily acting as instrumentalities or agencies of the United States, but does not include any contractor with the United States." 28 U.S.C. § 2671. "Employee of the government" is defined to include "officers or employees of any federal agency, members of the military or naval forces of the United States, members of the National Guard while engaged in training or duty ..., and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States, whether with or without compensation." § 2671.

26    Unlike section 1441, which only permits **removal** of claims which fall within congressional grants of statutory "original" jurisdiction, section 1442(a) permits **removal** of any claim which "arises under" Article III of the Constitution. *Mesa v. California,* 489 U.S. 121, 136–37, 109 S.Ct. 959, 103 L.Ed.2d 99 (1989). By this method, section 1442(a) avoids the limitations of the well-pleaded complaint rule. *Mesa,* 489 U.S. at 136–37, 109 S.Ct. 959; *see Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 494, 103 S.Ct. 1962, 76 L.Ed.2d 81 (1983) (Article III "arising under" jurisdiction broader than section 1331 statutory "arising under" jurisdiction).

27    The simplest way for a defendant to demonstrate that, for the purposes of **removal**, it was an "employee of the government" acting "within the scope of office or employment" is to obtain a certification to that effect from the Attorney General. *See* 28 U.S.C. § 2679(d)(2) (issuance of scope certification by Attorney General converts action against employee to one against the United States, requires Attorney General to **remove**, and conclusively establishes scope of office or employment for purposes of **removal**). Stepan has not presented a scope certification, nor has it expressed any intent to seek one.

28    The Office of the Alien Property Custodian was established by President Franklin D. Roosevelt on March 11, 1942. *See* Executive Order No. 9095, 7 Fed.Reg.1971 (1942). President Roosevelt delegated to the Custodian the broad powers granted to the President under the Trading With the Enemy Act of 1917, as amended by the First War Powers Act of 1941. Those powers included "the power to investigate, nullify and regulate transactions involving property in which foreign countries or nationals thereof ha[d] an interest and to vest any property or interest of any foreign country or national thereof ...; [with] such property or interest to be held, used, administered, liquidated, sold or otherwise dealt

with in the interest of and for the benefit of the United States." Paul V. Myron, *The Work of the Alien Property Custodian,* 11 Law & Contemp.Probs. 76, 77 (1945).

29   It is possible that the Custodian obtained, through the powers granted by the missing Supervisory Order No. 12, the ability to control an interest greater than that represented by the 23% stake vested. On the other hand, it may be that Supervisory Order No. 12 was merely issued, in an exercise of caution, to supplement the Custodian's powers over the shares listed in Vesting Order No. 206. Indeed, when Vesting Order No. 206 was issued it was apparently the Custodian's practice to issue supervisory orders solely for supplementary purposes. *See* Myron at 80 ("[o]riginally supervisory orders were issued supplementary to vesting orders, but this practice was abandoned in the latter part of 1942").

30   The letter carries the appearance of a form letter: the date, addressee, and reference line are all aligned at a slightly different angle, and typed in a noticeably darker font than the (generic) salutation, main body, and (typed) signature.

31   Stepan also cites two statements made in 1983 by then-Senator Bill Bradley. The first, contained in a June 17, 1983 "Dear Friend" constituent letter, reads, "the waste problems in Maywood stem primarily from thorium and rare earth operations conducted by the federal government at the Maywood Chemical Company Plant during World War II." Aronson Cert., Ex. C. Five days later, Senator Bradley, speaking from the Senate floor, also said, "[d]uring World War II the Maywood Chemical Works were taken over by the Government and worked on behalf of the war effort. Thorium and rare earths were produced for the Navy and later for the Atomic Energy Commission." 48 Cong.Rec. S8911 (daily ed. June 22, 1983). Senator Bradley did not identify any source for these statements, which are mere assertions of unsubstantiated opinion.

32   Normally, questions of pendant jurisdiction are addressed by reference to the supplemental jurisdiction statute, 28 U.S.C. § 1367, *see City of Chicago,* 522 U.S. at ——, 118 S.Ct. at 530 (pendant jurisdiction doctrine codified by Congress into § 1367), but section 1367 applies only to claims which fall within the "original" jurisdiction statutorily granted to the federal courts by Congress. Congress' grant of jurisdiction under section 1442(a) is not original in the statutory sense and can only be exercised in **removal** cases. However, the inapplicability of section 1367 is a distinction without a difference since section 1367 authorizes the exercise of supplemental jurisdiction to the full extent permitted by the Constitution, and the constitutional boundaries set forth in *Gibbs* are what govern here. *See Lyon v. Whisman,* 45 F.3d 758, 759 (3d Cir.1995) (Section 1367 incorporates standard set forth in *Gibbs* ).

33   When pendant jurisdiction extends to joined state-law claims, federal courts still retain discretion not to exercise it. *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130 (pendant jurisdiction "need not be exercised in every case in which it is found to exist .... [i]t has consistently been recognized ... [as] a doctrine of discretion, not of ... right."); *see* § 1367(c) (district courts have discretion to decline supplemental jurisdiction in four enumerated situations). For example, when state claims substantially predominate the federal court may decline to hear those claims. *Gibbs,* 383 U.S. at 726–27, 86 S.Ct. 1130 ("if it appears that the state issues substantially predominate ... the state claims may be ... left for resolution to state tribunals"); *see* § 1367(c)(2). Moreover, if the claim on which federal jurisdiction was founded has been dismissed, the court may, in its discretion, dismiss the state law claims as well. *Gibbs,* 383 U.S. at 726, 86 S.Ct. 1130 ("if the federal claims are dismissed before trial ... the state claims should be dismissed as well."); *see* § 1367(c)(3). Thus, if pendant jurisdiction here had extended to plaintiff's remaining state claims, and if no other independent basis for jurisdiction was found, then remand of the claims would have been appropriate, particularly in light of the efficiencies to be gained by returning this action to state court where the other individual actions against Stepan have been consolidated for the purposes of discovery. *See Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988).

---

**End of Document**                                          © 2021 Thomson Reuters. No claim to original U.S. Government Works.

# *EXHIBIT E*

DOLORES GRIECHEN,

                            Plaintiff,

vs.

BATH & BODY WORKS, INC., JOHN
DOES A-F (names being fictitious) and ABC
CORPORATIONS 1-10 (names being
fictitious) jointly, severally and/or in the
alternative,

                           Defendants.

_____

SUPERIOR COURT OF NEW JERSEY
LAW DIVISION: CAMDEN COUNTY

DOCKET NO.: CAM-L-002205-21

**NOTICE OF REMOVAL**

      Defendant Bath & Body Works, LLC, improperly designated as Bath & Body Works Inc.,

hereby notifies the Court that a Notice of Removal of the above captioned matter was filed in the

United States District Court for the District Court of New Jersey, on August 20, 2021.  A copy of

the Notice of Removal is attached as Exhibit "A" without exhibits.

      Dated: August 20, 2021

                                      *Leah A. Brndjar*
                            _____
                            Leah A. Brndjar (013132010)
                            Goldberg Segalla
                            301 Carnegie Center Drive, Suite 300
                            Princeton, NJ 08540
                            T: 609.986.1322
                            F: 609.986.1301
                            Attorney for Defendant

**<u>CERTIFICATE OF SERVICE</u>**

I HEREBY CERTIFY that on August 20, 2021, I electronically filed the foregoing with

the Clerk of the Court by using the CM/ECF system and provided a copy of the foregoing by U.S.

Mail, postage pre-paid upon Richard DiTomaso, 901 Route 38, Cherry Hill, NJ 08002.

_____
Leah A. Brndjar (013132010)

2